KELLOGG v. KELLOGG TOASTED CORN FLAKE CO.

1. TRADE-NAMES—INJUNCTION—RIGHT TO USE TRADE-NAME.
   In proceedings to enjoin defendant corporations and individual defendants, officers of defendant companies, from using the trade-name "Kellogg" in connection with prepared food products and goods of a similar character other than toasted corn flakes, where the evidence clearly shows that defendant corporation had used said trade-name and had spent large sums of money in advertising same previous to the organization of plaintiff corporation, the court below properly dismissed plaintiffs' bill and granted relief to defendants on their cross-bill.

On limitation of right to use one's own name as trade-name, see notes in 1 L. R. A. (N. S.) 660; 28 L. R. A. (N. S.) 934; L. R. A. 1916C, 255.

On use of trade-name on articles other than those to which it is applied by the owner, see notes in 30 L. R. A. (N. S.) 167; 47 L. R. A. (N. S.) 1002; L. R. A. 1918C, 1044.

2. SAME—INJUNCTIVE RELIEF—ESTOPPEL.

The action of the individual plaintiff in participating as an officer of defendant corporation in creating and strengthening its trade rights in the name "Kellogg" previous to the organization of plaintiff corporation, *held*, to estop him from claiming primary rights in said trade-name.

3. CONTRACTS—CONSTRUCTION—INTENT.

A contract should be construed so as to effectuate the intent of the parties when it was made.

4. SAME—SURROUNDING CIRCUMSTANCES TO BE CONSIDERED.

To ascertain the intent of the parties a contract should be construed in the light of the circumstances existing at the time it was made.

5. SAME—CONSTRUCTION—TRADE-NAME.

A contract between plaintiff corporation and defendant corporation, ending litigation between them over their respective rights in the trade-name "Kellogg," construed, and *held*, to concede to plaintiff corporation the right to use said name in the restricted manner specified in the contract, and other than this the unrestricted use was conceded to defendant corporation.

6. RES JUDICATA—COURT OF APPEALS OF DISTRICT OF COLUMBIA—TRADE-NAMES.

Plaintiffs' contention that their right to the use of the trade-name "Kellogg" was adjudicated by a recent decision in the Court of Appeals of the District of Columbia (Kellogg Food Co. *v.* Kellogg Toasted Corn Flake Co., 46 App. Cas. D. C. 521), *held*, not sustained by the record, which presented a question of pleading only, the question not having been disposed of upon its merits.

7. APPEAL AND ERROR—PARTY NOT APPEALING.

On appeal from a decree in chancery, no modification or change will be made in favor of a party who does not appeal.

Appeal from Calhoun; North (Walter H.), J. Submitted June 8, 1920. (Docket No. 12.) Decided December 21, 1920. Rehearing denied March 31, 1921.

Bill by John Harvey Kellogg and others against the

Kellogg Toasted Corn Flake Company and others to enjoin the use of a trade-name, and for an accounting. Defendants filed a cross-bill claiming affirmative relief. From a decree dismissing the bill and granting in part the prayer of the cross-bill, plaintiffs appeal. Affirmed.

*Fred L. Chappell* and *Ira A. Beck* (*John J. Carton*, of counsel), for plaintiffs.

*W. H. Clarke* and *John W. Bailey*, for defendants.

STONE, J. The bill of complaint herein was filed by Dr. John H. Kellogg, head of the Battle Creek Sanitarium, and by the companies under his control. The case presents questions involving trade-names and claimed unfair competition. The plaintiff complains against the Kellogg Toasted Corn Flake Company, Will K. Kellogg, a brother of Dr. Kellogg, and other defendant companies controlled by him, and John L. Kellogg, son of Will K. Kellogg, said Will K. Kellogg and John L. Kellogg being officers in control of defendant companies. An injunction is sought by plaintiffs to restrain the defendants from the use of the name Kellogg in connection with any business other than the business in toasted corn flakes (including biscuits) within the United States, and also to restrain the claimed unwarranted use of the name "Kellogg" as a part of the corporate name of the defendants W. K. Kellogg Cereal Company, the Kellogg Laboratories, Incorporated, and the Kellogg Candy Company, such companies having been organized subsequently to the incorporation of the plaintiff The Kellogg Food Company; also to restrain the use of the name "Kellogg" by Will K. Kellogg and John L. Kellogg in such business; and also to restrain the threatened use of the secret formulæ and processes of Dr. Kellogg; and also

212—Mich.—7.

to account for the profits derived from the business; and also the damages.

The defendants by their answer and cross-bill claim exclusive ownership of the trade-mark "Kellogg's" through prior user, through Dr. Kellogg's participation in and profiting by the action of the Corn Flake Company in adopting said trade-mark or name, through the action of the Sanitas Nut Food Company, Ltd., in dropping the Will K. Kellogg signature, and through the fact that as the Kellogg Toasted Corn Flake Company owns the trade-mark on some products, the plaintiffs can have no right to deceive the public by its use on other products. There was prayer for injunction and accounting. The hearing below was mainly on evidence taken in open court, largely documentary, and on depositions as to certain claimed confusion. The bill of complaint was dismissed. The cross-bill of defendants was substantially sustained and the relief sought, in the main, granted. The plaintiffs have appealed. The defendants have not appealed. It is important to keep in mind the fact that defendants have not appealed from the decree below, in view of certain claims of defendants that the decree should be broadened in their interest or favor.

The decree below not only dismissed the bill of complaint, but it found and adjudicated that the defendant Kellogg Toasted Corn Flake Company, formerly known as Battle Creek Toasted Corn Flake Company, and also as Toasted Corn Flake Company, was, and ever since May, 1907, had been, the sole and exclusive owner of the trade-name or mark "Kellogg's" on prepared food products and goods of a similar character, but that the plaintiff Kellogg Food Company on February 15, 1911, was permitted by the defendant Kellogg Toasted Corn Flake Company to use within the United States the name of Kellogg Food Company on flaked cereal foods, as the manufacturer of such goods, so

long as said name should occupy space not exceeding three-quarters of an inch in height, and be located at the bottom of the carton, with the word "Kellogg" in such name in the same style and type and printed in the same colored ink, and no more conspicuous than the other words in said company name; and that said plaintiff Kellogg Food Company was further permitted to use within the United States the *fac-simile* signature of John Harvey Kellogg on its flaked cereal food cartons, so long as it is of the same size and form as appearing on the toasted rice flakes on February 15, 1911, and so long as it is used once only on each carton, and not on either face of the carton, but only on the side or end.

It was further decreed that the use by the plaintiffs on the labels or containers of their goods or advertising matter of the word "Kellogg's," as part or all of the name or title, or designating words of any food products, candies, health products, health beverages or the like, was, and from the beginning has been, in violation of the rights of the defendant Kellogg Toasted Corn Flake Company. That the defendant Kellogg Toasted Corn Flake Company do have and recover from the plaintiffs John Harvey Kellogg and The Kellogg Food Company the profits, gains or advantages which the said plaintiffs or either of them have received, or made, or which have arisen or accrued to them, or either of them, from the infringement of said trade-name "Kellogg's," by the making and using or selling of any food products, candies, health products, health beverages, or the like, within the United States, having placed thereon, as part of the name or title, or designating words thereof, the said trade-name "Kellogg's." And that the defendant Kellogg Toasted Corn Flake Company do have and recover from said plaintiffs the full amount of any damages suffered by the defendants, by reason of the infring-

ing acts of the plaintiffs, within the United States, and reference was made to a commissioner to ascertain and take and state and report to said court an account of the said matters.

We have spent weeks in the examination of the immense record, the numerous exhibits, and the lengthy briefs in the case. It would be idle to attempt to set out in this opinion even an abstract of the pleadings or evidence, within any reasonable limit. Without here reviewing the evidence at length it may be said that it goes to prove that it was the defendant the Kellogg Toasted Corn Flake Company and its predecessors that first adopted and established as a trade-name the word "Kellogg" or "Kellogg's"; and it is a necessary conclusion from the evidence that the commercial term "Kellogg," as applied to food products, not only originated with said defendant company or its predecessors, but that it now belongs to said company, subject only to the rights obtained by two of the plaintiffs under the contract of February 15, 1911, hereafter referred to.

Upon a review of the entire case we are led to the conclusion that the claim of the plaintiffs, in their bill of complaint, has not been established; that they have not sustained the burden of proof, and that neither upon the law nor the facts are the plaintiffs entitled to the relief prayed for in their bill of complaint. In this court the defendants in their main brief, after quoting at large from 26 Ruling Case Law, pp. 869-871, on the subject of the "Infringement of Trade-Marks," state their claims under their cross-bill as follows:

"Appellees rely on four facts and four rules of law applicable thereto.

"First Fact: Appellee Corn Flake Company first adopted, advertised and registered the trade-mark 'Kellogg's.'

"First Rule of Law: The trade-mark or trade-name is the property of those who made it valuable, and its use by others than those who earned a reputation thereunder would be a fraud upon the public.

"Second Fact: Dr. Kellogg participated in, and made large profits and capital returns from the adoption, commercialization and wide advertising of the trade-mark 'Kellogg's' by appellee Corn Flake Company.

"Second Rule of Law: One who participates in and profits by the adoption of a trade-mark is estopped to injure or appropriate it.

"Third Fact: Appellee Corn Flake Company never, at any time, by the 1911 contract, or otherwise, transferred to Dr. Kellogg or his company any business or any right to use, infringe or trail on its registered trade-mark 'Kellogg's,' and appellants do not claim that any such right was ever granted to or settled upon them.

"Third Rule of Law: A trade-mark cannot exist as an extrinsic thing and cannot be licensed apart from the business in which it is used. Appellee Corn Flake Company, even if it had desired to do so, could not have transferred, granted or otherwise alienated any right to Dr. Kellogg to defraud and deceive the public by trailing spurious products on its registered trademark, and Dr. Kellogg had no such right as an extrinsic thing, and could grant no such right to the Kellogg Food Company.

"Fourth Fact: Appellants are trailing their Kellogg's Bran and other Kellogg's products on the trade-mark, advertising, good will, trade guarantees, selling helps, name and reputation of appellee Corn Flake Company by deceiving and confusing the trade and public.

"Fourth Rule of Law: Equity will not permit a rival manufacturer to trail his different products on the established trade-mark and reputation of another."

Counsel cite many cases upon the questions of trade-mark and unfair competition in support of their position.

After as thorough examination of the case, and of the questions involved, as we are able to make, we

find ourselves so much in accord with the opinion and findings of the learned circuit judge who heard the case at the circuit, that we are disposed to adopt the same, and affirm the decree below. In his history of the case, and of the matters leading up to it, he presents so clearly and thoroughly the salient questions involved and decided, that we cannot do better than quote therefrom. Among other things he said:

"It appears from the record in this case that the Battle Creek Toasted Corn Flake Company, which was a predecessor of the Kellogg Toasted Corn Flake Company, was incorporated on the 19th day of February, 1906. For many years prior to this date Dr. John H. Kellogg and Will K. Kellogg, who are brothers, had been engaged in the manufacture and sale of various food articles. During the early years of their activities in these lines, the business was, more or less, closely associated with and carried on in connection with the Battle Creek Sanitarium. Dr. John H. Kellogg has been the superintendent and acknowledged head of this institution for upwards of 40 years. He has made extensive studies and gained a wide repute as a dietitian; and it was his efforts along these lines which was the primary cause of these brothers developing and in a limited way marketing many so-called health food products.

"On the 21st day of January, 1899, Dr. Kellogg caused the organization of the Sanitas Nut Food Company, Ltd. He became the holder of all the stock in this association with the exception of two shares, one of which was held by W. K. Kellogg. At the time of the organization of this company a contract was entered into between it and W. K. Kellogg and also a contract was entered into between Dr. Kellogg and W. K. Kellogg. By the terms of these contracts W. K. Kellogg became the general manager of the affairs of this company for a period of 20 years and in consideration thereof obtained the one-fourth interest in the profits of the business of said company. The food propositions in which these men were interested were developed from time to time. Ultimately one portion of the food became known as the Sanitarium line, while another

portion, which was manufactured by the Sanitas Nut Food Company, Ltd., was known as the Sanitas line. This line of demarcation, however, seems to have been comprehended only by those who were in close touch with the management of the food business of these parties. All of these foods (or at least for the most part) were placed upon the market under the trade-name of 'Sanitas.' One portion of the foods manufactured by the Sanitas Nut Food Company, Ltd., was made from nuts; and somewhere about the year 1903 there was placed on this line of products the expression, 'None genuine without the signature of Will K. Kellogg.' This was done by an arrangement which was mutually satisfactory to all parties concerned; but just why it was done does not very clearly appear from the records in this case. It does appear without dispute from the testimony that Dr. John H. Kellogg, at this time and for some years thereafter, insisted that his name should not be used in connection with the manufacture and sale of food products; giving as his reasons therefor that his standing as a physician would be impaired, and he would be charged with unprofessional conduct if he allowed his name to be commercialized. In any event the name of Dr. John H. Kellogg, as such, was never intentionally developed along commercial lines in connection with the affairs of the Sanitas Nut Food Company, Ltd. The only way in which the name 'Kellogg' appeared in direct connection with the commercial affairs of this company prior to 1902 or 1903 was by the use of the individual name Will K. Kellogg, and in the most part by the rather inconspicuous use of the *fac-simile* signature of Will K. Kellogg upon the labels applied to the nut foods, as above indicated. At no time was this *fac-simile* signature of Will K. Kellogg applied to the flaked cereal foods marketed by the Sanitas Nut Food Company, Ltd., prior to the development of the business of the Battle Creek Toasted Corn Flake Company.

"In 1905 or early in 1906 it became evident that the toasted corn flakes, which had been developed and marketed by the Sanitas Nut Food Company, Ltd., was very probably a success as a commercial product. On the 22d day of January, 1906, Dr. John H. Kellogg executed a proposition in writing (Exhibit C attached

to defendants' cross-bill) whereby he proposed for a specified consideration to transfer to a corporation to be organized the secret formulæ and processes relative to and the exclusive right to manufacture and sell 'toasted corn flakes' and 'toasted corn flake biscuits,' together with the general business and good-will incident thereto. On the 8th day of February, 1906, the proposition of Dr. Kellogg was duly accepted by Chas. D. Bolin and Will K. Kellogg. Thereafter and on the 19th day of February, 1906, the Battle Creek Toasted Corn Flake Company was incorporated substantially in accordance with the provisions contained in the proposition above referred to; and on the 5th day of March, 1906, Dr. Kellogg executed a bill of sale (Exhibit E attached to cross-bill) which in effect carried out the terms of the propositions of sale theretofore made by Dr. Kellogg, limiting, however, the business to the United States—a provision which was not embodied in the original proposal.

᠈ "The Battle Creek Toasted Corn Flake Company immediately began to manufacture and sell toasted corn flakes. The trade-name by which the product was known on the market was 'Sanitas,' the same as it had been known before the transfer of this portion of the business by the Sanitas Food Company, Ltd., through Dr. Kellogg's contract. The only way in which the word Kellogg was used at this time in connection with the manufacture and sale of toasted corn flakes was by using the expression—'None genuine without the signature of W. K. Kellogg.' The product was marketed under the trade-name 'Sanitas' until 1907. While the *fac-simile* signature 'W. K. Kellogg' was placed upon the cartons of the Battle Creek Toasted Corn Flake Company practically at the beginning of its business, the food manufactured and sold by it was not known or designated under the trade-name 'Kellogg' or 'Kellogg's' until May or June, 1907. At that time the name 'Kellogg' as a trade-name was conspicuously placed upon the cartons of the Toasted Corn Flake Company (to which the name of the Battle Creek Toasted Corn Flake Company had been changed, May 16, 1907). And from that time on 'Kellogg' or 'Kellogg's' was continuously and extensively used as the designating name of the corn flakes

manufactured and sold by the Toasted Corn Flake Company.

"If Dr. Kellogg expected to claim commercial rights from the prestige of the name Kellogg which had arisen incident to the Battle Creek Sanitarium and from the doctor's reputation as the head of that institution, it seems passing strange that he never attached his name to any of the various food products or to the advertising matter incident thereto in such a way as to identify him and his product with Dr. John H. Kellogg of the Battle Creek Sanitarium. In other words, the fact that Dr. Kellogg did not before 1908 identify himself as Dr. Kellogg with any of his commercial products is inconsistent with his present claim that the word 'Kellogg' as used incident to these manufactured products necessarily means 'Dr. John H. Kellogg.' In coming to this conclusion I have not overlooked the fact that in a very small way Dr. Kellogg's name may have been published in France or Germany in connection with the manufacture of certain food products.

"The case at bar is not like the Sebastian Kneipp case (82 Fed. 321), because there the Rev. Kneipp had not only gained notoriety in connection with a sanitarium and relative to his system of dietetics, his writing, etc., but 'the plaintiffs under his approval and supervision prepared and put on the market a malt coffee and obtained the right from him to use his name, portrait or signature. The word "Kneipp" and his portrait and signature were registered in the United States and other countries.' In other words, this case presents a situation where the man whose name was involved was not only famous as a dietitian, etc., but a business was actually organized and developed around that name, even going so far as to register the name.

"Letters by Dr. Kellogg, as well as other items of evidence in this case, show quite conclusively that the name Kellogg was commercialized not by Dr. Kellogg, but in spite of him. Exhibit P-226 is a letter written by Dr. Kellogg on the 17th day of July, 1908, in which he stated, 'while my reluctance to allow my name to be used in a commercial way is just as strong as it ever was, the fact that it has to all intent and purposes

been so widely used, has finally led me to make up my mind to accept the situation and to in some way identify my name with all my food products as the only way by which they may be protected.' Also in another letter dated July 23, 1908 (Exhibit D-325), Dr. Kellogg stated, relative to the use of 'Kellogg's' by himself and his associates: 'At the present time the action that has been taken by the Kellogg Food Company has not gone far enough to work any mischief whatever to the Toasted Corn Flake Company and might be recalled if circumstances justify such action.' It should be borne in mind that this letter was written at a time when the Toasted Corn Flake Company or its immediate predecessors had already spent millions of dollars in a consistent and persistent effort to commercialize the name 'Kellogg' and to make it a distinguishing name by which the products of that company should be known to the trade.

"On this phase of the case it is worthy of note that in all of the negotiations, propositions or contracts (so far as the same appear in writing), which refer to the sale of the product toasted corn flakes, the word 'Kellogg' or 'Kellogg's' as a trade term or asset was not mentioned. Nothing was said as to the vendor reserving the right to use these words on account of their commercial value, nor anything said by which the right to use the name was granted to the vendees, nor was such right denied to them. The trade-name feature of these transactions seems to have been embodied in the word 'Sanitas.' If at that time the word 'Kellogg's' had any trade significance or value it seems certain to me that the rights which were granted or withheld relative thereto would have been specified, or at least referred to in some way in the documents which were then being promulgated between these parties and having to do with rights of this very character. The bill of sale executed at the time by Dr. Kellogg recites that said toasted corn flakes were known 'under the trade-name "Sanitas".' Surely if this comparatively new product of the Sanitas Company was thus known to the trade, its older products which had been marketed for years 'under the trade-name "Sanitas"' must have also been known to the trade as 'Sanitas'; and if this is true it is evident that

the products in the manufacturing and marketing of which Dr. Kellogg was interested were not at that time known to the trade as 'Kellogg's.'   *   *   *

"It would be useless to enumerate here all of the things developed at the hearing of this case which go to prove quite conclusively that it was the Kellogg Toasted Corn Flake Company and its predecessors that first adopted and established as a trade-name the word 'Kellogg' or 'Kellogg's,' but I am convinced that this is a fact which has been established in this record beyond any reasonable question.

"If, however, it is to be conceded that there is some question as to the priority of rights in this trade-name, still I am of the opinion that there is another phase of this controversy which may necessarily bring one to a conclusion adverse to the plaintiffs' claim upon the theory that Dr. John H. Kellogg has conducted himself in such a way relative to the commercial use of this name by the Kellogg Toasted Corn Flake Company that he is now estopped from assuming a contrary position; or to say the least, he should be denied equitable relief of the character which he is now seeking for himself and his companies.

"As bearing upon this phase of the case one cannot overlook the fact that at the time of the original sale of the Toasted Corn Flake interests, the Battle Creek Toasted Corn Flake Company was organized with a capital stock of two hundred twenty-five thousand dollars ($225,000). Dr. Kellogg became the owner of more than one-third of the stock and for a considerable time continued to have the largest holdings of any individual in this company. Immediately after its incorporation in 1906 this company began to use the signature of W. K. Kellogg upon packages and has always continued to do so. While I am of the opinion that using this name in this way while the packages bore the name 'Sanitas' as a trade-name, would not vest in the company a commercial right in the name 'Kellogg'; still it is quite evident that such a use of the name 'Kellogg' by the newly organized company (in which Dr. Kellogg was a director and the largest stockholder) without protest by Dr. Kellogg ought at least to create in that company rights equal to any which

could be claimed by the Sanitas Food Company, or Dr. Kellogg growing out of a similar use.

"But following this use, and within a very few months the word 'Sanitas' was entirely supplanted by the word 'Kellogg's' as a designating name of the products of the Toasted Corn Flake Company. Dr. Kellogg was an officer of this company and still a very large stockholder at a time when the company was spending hundreds of thousands and perhaps millions of dollars in creating and strengthening its trade rights in this name. Dr. Kellogg never made anything like a genuine protest in regard to such action on the part of this company. It will not do for him to claim that he was helpless in this regard; because, if he had the rights in this name at that time which he now claims, he had his remedy in the court which was equally as available to him at that time as it was when this suit was started. The record discloses that Dr. Kellogg was not unfamiliar with court proceedings of this character at that time, but on the contrary he knew that courts could and would protect such rights.

"Instead of protesting as to this use and development of the name 'Kellogg' by the Toasted Corn Flake Company, or instituting legal proceedings, Dr. Kellogg's conduct was all to the contrary. On the 8th day of July, 1908, Dr. Kellogg, as a director of the Toasted Corn Flake Company, offered a resolution relative to starting certain litigation, the purpose of which was to protect and preserve in that company the right to use the name 'Kellogg' as a trade-name. In September of that same year he offered a resolution whereby the authorized capital stock of the Toasted Corn Flake Company was increased to a million dollars, and a stock dividend was declared, in which Dr. Kellogg participated, to the extent of many thousands of dollars. This stock as well as all of his other holdings in the Toasted Corn Flake Company was disposed of by Dr. Kellogg; and from such sales he realized upwards of a quarter of a million dollars. By this litigation Dr. Kellogg seeks to take from the purchasers of his stock and the other defendants herein practically all of the benefits which have accrued to them from the course of conduct in which Dr. Kellogg

acquiesced and which made it possible for him to reap large benefits by disposing of his stock in the manner indicated.

"To me it seems so plain as to need no argument, that Dr. Kellogg's conduct, in the particulars just above recited, has been such that after he has wholly disposed of his own interests in the Toasted Corn Flake Company he cannot be heard to say that he is entitled to equitable relief to the extent and character sought in this case, regardless of who, in some limited way, may have had the prior commercial rights in the name 'Kellogg.'

"It may be a question if what is between the lines in the case does not convince one that the first use of the signature W. K. Kellogg was an attempt by all parties concerned to get the benefit of Dr. Kellogg's reputation as a dietitian and as the well-known head of the Battle Creek Sanitarium, but at the same time avoid actually using his name so as to save Dr. Kellogg from a charge of unprofessional conduct. But even if that is true the conduct of Dr. Kellogg above recited should now estop him from claiming that he developed the trade-name 'Kellogg' and has the primary rights therein.

"The consideration of the case thus far has been principally on the basis of matters as they had developed on or before the 18th day of July, 1908, at which time the business of Dr. Kellogg and his associates was transferred to a newly incorporated company which bore the name 'Kellogg Food Company.' On the 17th day of December following, this name was changed to 'The Kellogg Food Company.' It is the claim of the plaintiffs that this new organization was created under this name for the purpose of enabling them to secure and preserve to themselves the commercial rights which they claim to have had in the name 'Kellogg.' Among other things, this new company placed upon the market toasted rice flakes; and the containers in which this product was sold (after some changes) bore the name 'Kellogg' as a distinguishing feature. Evidently in an effort to meet this situation the Toasted Corn Flake Company, on the 16th day of May, 1909, changed its name to 'Kellogg Toasted Corn Flake Company.' Confusion in trade naturally re-

sulted, and, in 1910 the Kellogg Toasted Corn Flake Company instituted a suit against The Kellogg Food Company, *et al.,* whereby it was sought to adjudicate the conflicting trade rights of the parties. While this suit was pending the parties entered into a contract on the 15th day of February, 1911, and the construction to be given this contract is a matter of controversy in this suit. However, what has been heretofore said in this finding practically disposes of this question. In other words, it is a necessary conclusion arising from the testimony in this case, in my judgment, that the commercial term 'Kellogg,' as applied to food products, originated with the Kellogg Toasted Corn Flake Company or its predecessors, and now belongs to the Kellogg Toasted Corn Flake Company, subject only to the rights obtained by two of the plaintiffs under the contract of February 15, 1911. (The contract of February 15, 1911, will be found in the margin.)

"It seems to me that the construction of this contract contended for by the plaintiffs is entirely unwarranted in view of the wording of the contract and the circumstances under which it was executed; and such a construction would greatly broaden the scope of this contract which was prepared under the supervision of able counsel who is not at all in accord with the plaintiffs in this case as to what this contract was

---

MEMORANDUM OF AGREEMENT made this fifteenth day of February, 1911, between JOHN HARVEY KELLOGG, THE KELLOGG FOOD COMPANY, and the KELLOGG TOASTED RICE FLAKE AND BISCUIT COMPANY, all of Battle Creek, Michigan, of the first part, and the KELLOGG TOASTED CORN FLAKE COMPANY, of the same place, of the second part.

FIRST.

The parties of the first part, and each of them covenant and agree to and with the party of the second part that they will not from and after thirty days from this date, use the *word* *"Kellogg" as a part of the name or title or designating words of any flaked cereal foods,* made or sold by them, or any of them. Flaked cereal food to include biscuits made from flaked cereals. This covenant shall cover such use not only on containers, but in advertising matter, circulars and all other uses of the name in the trade or business of making or selling such flaked cereal foods.

intended to do. In the litigation which was then pending and which was to be terminated by this contract the parties on each side claimed to be the originators of the word 'Kellogg' as a trade-name and each claimed the exclusive right thereto. If it had been the intent of either party by this instrument to concede that the other party would have such rights, it would have been easily and plainly so stated; and it could have been, and probably would have been, set forth that the other party in his use of such trade-name was a mere licensee. The construction that this agreement should receive is that it was a commendable effort on the part of these brothers to dispose of the pending litigation in which each, as just stated, was claiming the exclusive right to the name 'Kellogg' as a trade-name used in connection with cereal foods. Concessions were made by each. The Kellogg Toasted Corn Flake Company conceded the right to Dr. Kellogg to use the name in the restricted manner specified in the contract; and other than this the unrestricted use was conceded to the Kellogg Toasted Corn Flake Company, which paid Dr. Kellogg ten thousand dollars ($10,000) for this concession, and the suit was thereupon dismissed without costs to either parties. That

---

It is understood that on cartons or containers of such food the parties of the first part may continue to use the name "Kellogg Food Company," or the name, "The Kellogg Toasted Rice Flake and Biscuit Company," as the manufacturer of such food, but it is covenanted and agreed that the name of the company so putting out such food shall occupy space on the carton not exceeding three-fourths of an inch in height, and at the bottom of the carton, and that the word "Kellogg" in such name, is to be in the same type and style, printed in the same colored ink, and to be no more conspicuous than the other words in the name of the company.

It is understood and agreed that the *fac-simile* signature of John Harvey Kellogg, as now appearing on the end of the cartons of Toasted Rice Flakes, may be used, but the parties of the first part covenant and agree that such *fac-simile* signature shall not be of a larger size than that now appearing on the Toasted Rice Flake carton, and that it shall appear once only on each carton and not on either face of the carton, but only on the side or end. The above restrictions relating to the use of the name "Kellogg" refer to such use in the United States only.

this was the intent of all parties is clearly shown by their immediate subsequent conduct in their business affairs. And further, even before the suit was instituted, as is stated in plaintiffs' reply brief,—'it will be remembered that at that time (1908, 1909, and 1910) the directors of the Kellogg Toasted Corn Flake Company were meeting at frequent intervals and passing resolutions to pay Dr. Kellogg anywhere from ten thousand ($10,000) to fifty thousand ($50,000) dollars for exclusive rights in his name'; and this and the suit brought to settle the same questions resulted in the agreement of February 15, 1911.

"In their briefs filed plaintiffs' counsel have taken the position that the recent decision in the court of appeals of the District of Columbia is an adjudication establishing the correctness of their contention as to the construction which should be placed upon this contract. I do not so understand the decision rendered, but, on the other hand, it appears to me to be simply a determination that the papers filed by the opposers in the trade-mark opposition proceedings in the patent office are sufficient in form. In any event, I am of the opinion that under the facts and circumstances shown in this record, the plaintiffs have not established their

SECOND.

The matter of furnishing by the second party to The Kellogg Food Company of toasted corn flakes as provided in the proposition made by John Harvey Kellogg to the Battle Creek Toasted Corn Flake Company, dated the 24th day of February, 1906, wherein it is provided that said Battle Creek Toasted Corn Flake Company "is to furnish the Sanitas Nut Food Company, Limited, of Battle Creek, with sufficient quantity of said food products at five per cent. above the cost of production, with which to supply its trade to consumers only."

The said "Kellogg Food Company" representing itself to be the successor in interest of the Sanitas Nut Food Company, Limited, and entitled to the benefits, if any, thereof, it is agreed:

The second party shall furnish such toasted corn flakes for consumers trade, only in containers to be furnished by The Kellogg Food Company, which containers shall not bear the word "Kellogg" in any form or connection and which containers shall not resemble in style or appearance the containers used by the second party for toasted corn flakes as furnished to their regular trade.

claim as to the correctness of the construction sought to be given to this contract by them.

"In addition to the foregoing finding, it will be only necessary to briefly call attention to some particular phases of the case."   *   *   *

We agree with the circuit judge in his findings upon the subjects of Secret Processes and Formulæ; Surgical Devices, etc.; Foreign Trade; Bran; Cero-Vita; Candy, Drinket, etc.; and Deception in Trade, but owing to their length do not insert them here. The opinion concludes as follows:

"It follows from the finding already made that the plaintiffs are not entitled to the relief sought in the bill of complaint and same should be dismissed, with costs to be taxed. The defendants may take a decree granting them relief in accordance with these findings; and it would follow that they are entitled to an accounting. However, this litigation is of such a character that I think the accounting should be withheld until an opportunity has been had to secure a final adjudication of the main case; and also that the injunctive relief to which the defendants are entitled

---

Second party will give The Kellogg Food Company plates they have for printing cartons with the name "Sanitas Corn Flakes."

As The Kellogg Food Company claims that the change in the style of the containers to be used for toasted corn flakes, so to be furnished for their consumers trade, may diminish their trade, the second party hereby guarantees them against any loss resulting. To determine whether there is such a loss, the business of The Kellogg Food Company in such toasted corn flakes for consumers trade for the year ending July 31, 1910, shall be taken to represent the average business done, and yearly after the second party begins to furnish such toasted corn flakes in such containers to be furnished by The Kellogg Food Company, an adjustment shall be had, and the second party will pay any damage resulting from decrease in the business over that for the year ending July 31, 1910, and this guarantee shall continue for the period of fifteen years. Such corn flakes for consumers trade shall be furnished by the second party at cost of production. plus five per cent. Any and all claims for damages on account of not having furnished toasted corn flakes for such consumers

should be held in abeyance for a sufficient time after settling the decree to enable the plaintiffs to perfect an appeal, and in the event of an appeal until such time as a determination is made by the Supreme Court."

It is the claim of appellants that the contract of February 15, 1911, was a settlement of all controversies to that date, and that it contains matters by inference which it does not state in detail.

The Kellogg Toasted Corn Flake Company insists that it never intended to, and did not, by said contract convey to appellants any rights whatever to use the trade-mark "Kellogg's" as a distinguishing name in the United States or any foreign country. The "situation" at that date has been clearly stated by the circuit judge in his opinion. The contract of February 15, 1911, should be construed so as to effectuate the intent of the parties when it was made. To ascertain the intent of the parties a contract should be construed in the light of the circumstances existing at the time it was made. *Ferris* v. *Wilcox*, 51 Mich. 105;

---

trade are hereby waived and relinquished. But the party of the second part agrees to reimburse the parties of the first part for the loss sustained by them for being obliged to buy in the open market. The amount of loss to be determined by the number of cases purchased during the six months preceding the beginning of the suit.

THIRD.

The parties of the first part covenant they will not nor shall either of them make toasted corn flakes within the United States, and they shall not, nor shall either of them, put out toasted corn flakes in containers resembling in general appearance those used by the second party. The second party agrees to make toasted corn flakes for the export trade of said John Harvey Kellogg at actual cost, plus twenty-five cents per case of thirty-six packages of substantially the size now used; the containers therefor, to be furnished by said John Harvey Kellogg, provided:

(a) The second party shall not be required hereunder to furnish more than two hundred and fifty cases per day.

*Kunzie* v. *Nibbelink*, 199 Mich. 308, 314; *Ardis* v. *Railway Co.*, 200 Mich. 400, 411; *Michigan Crown Fender Co.* v. *Welch*, 211 Mich. 148, 161.

In the last cited case this court said:

"The language employed, subject-matter, and surrounding circumstances under which the parties entered into the agreement are all proper subjects for consideration as aids in determining their intent and mutual understanding."

Applying the above rule it should be borne in mind that the defendant Kellogg Toasted Corn Flake Company and its immediate predecessors had already spent a large sum of money in a consistent and persistent effort to commercialize the name "Kellogg," and to make it a distinguishing name, by which the product of that company should be known to the trade. That right was not surrendered by the contract. It did not transfer to Dr. Kellogg, or The Kellogg Food Company, any business, or any right to use its registered trade-mark "Kellogg's," and no such inference can be drawn from the agreement. Said agreement by defining certain rights, and by excluding or failing to define other rights, shows that the parties were unable to agree on the rights outside of those that were specified and settled.

The defendant Kellogg Toasted Corn Flake Company urges, we think with much force, that neither by

(*b*) The second party shall not be required to put said flakes in other than ordinary paper cartons and shall not be required to use parafine or other special arrangement for the protection of such flakes for shipment.

(*c*) Such corn flakes so furnished for export trade shall be so disposed of as to insure their not coming into the market in the United States.

(*d*) In case the said party of the second part shall fail to furnish said flakes as above specified the party of the first part shall be at liberty to manufacture the same in the United States for export only.

the contract of February 15, 1911, nor by any other act has it given the plaintiffs, or any of them, any right of trailing their products under the trade-mark "Kellogg's," and that defendants could not have done so had they wanted to, as such a trade-mark license is void and unlawful. *Detroit Creamery Co.* v. *Ice Cream Co.*, 187 Mich. 312.

Referring to the opposition proceedings in Washington, the record presents a question of pleading only. In the patent office The Kellogg Food Company and Dr. Kellogg filed opposition to the application of the Kellogg Toasted Corn Flake Company for the registration of the trade-mark signature "Kellogg's." The attorney for the Kellogg Toasted Corn Flake Company was of the opinion that the allegations in the opposition were too vague and indefinite to constitute issues for the trial. A motion was filed in the patent office to dismiss the opposition on the ground principally that it failed clearly to allege that the food products of the opposers were distinguished as Kellogg's foods, at a date prior to the first adoption and use of the name "Kellogg's" by the applicant.

It appears that opposition proceedings in the patent office are conducted under United States Equity Rules, and this motion to dismiss was filed under Equity Rule 29. The examiner of interferences sustained the motion to dismiss the opposition. The opposers then ap-

---

FOURTH.

The first parties and each of them hereby covenant and agree not to divulge to others any formula for the manufacture of flaked cereal foods, except:

(a) As the same is divulged to their own employees, with an agreement with the employees not to divulge the same, or—

(b) As the same is divulged in connection with the actual sale of the good-will of the business of manufacturing some specific food other than corn flakes, and then only on the express agreement with the vendee, that such formula shall be used only in the manufacture of such specified food.

pealed to the assistant commissioner of patents. After an amendment of the opposition the assistant commissioner sustained the motion to dismiss, thereby holding in effect that the opposition, even after being amended, did not properly and definitely state a case sufficient to go to trial. The opposers then appealed to the court of appeals of the District of Columbia (*Kellogg Food Co.* v. *Kellogg Toasted Corn Flake Co.*, 46 App. Cas. D. C. 521), and that court reversed the decisions below. The gist of the court of appeals' decision is in the following statement quoted from that opinion:

"It is clearly averred that the opposer's products of the same general descriptive properties were known as 'Kellogg's Foods' before applicants' entry into the field."

The motion to dismiss having been overruled, the applicant has filed in the patent office an answer to the opposition, and testimony in opposition and on behalf of applicant will later be taken. Proceedings have been stayed until the instant case has been decided. Thus it appears that the question has not been disposed of on its merits.

---

### FIFTH.

The certain suit now pending in the circuit court for the county of Calhoun, in chancery, wherein the second party is complainant and the first parties are defendants, together with the cross suit or bill, wherein the first parties are cross-complainants and the second party and Will K. Kellogg are cross-defendants, shall be dismissed without costs to either party.

### SIXTH.

In consideration hereof the second parties pay to the parties of the first part TEN THOUSAND DOLLARS, receipt of which is acknowledged.

### SEVENTH.

This agreement shall bind and be for the benefit of the parties hereto, and their respective heirs, representatives, successors or assigns.

(Duly signed by the respective parties.)

As to the claim of the defendants that the decree below should be enlarged and broadened in their interest, it is sufficient to say that on appeal from a decree in chancery no modification or change will be made in favor of a party who does not appeal. *Herpel* v. *Herpel*, 162 Mich. 606; *Proctor* v. *Robinson*, 35 Mich. 284, and note.

The decree below is affirmed, with costs to the defendants.

MOORE, C. J., and STEERE, BROOKE, FELLOWS, CLARK, BIRD, and SHARPE, JJ., concurred.