THE MANHATTAN SHIRT COMPANY, a corporation of the State of New York,

*vs.*

SARNOFF-IRVING HAT STORES, INC., a corporation of the State of New York, and MORRIS MINTZ, defendants, and ROBERT REIS & COMPANY, intervening defendant.

*New Castle, Jan.* 17, 1933.

*William G. Mahaffy* and *Ellis W. Leavenworth,* of the firm of Watson, Bristol, Johnson & Leavenworth, and *Her-*

*bert H. Maass,* of the firm of Maass & Davidson, both of New York City, for complainant.

*Hugh M. Morris* and *G. Burton Pearson, Jr.,* and *Wallace H. Martin,* of the firm of Nims & Verdi, of New York City, for defendants and intervenor.

THE CHANCELLOR: The complainant does not deny the execution of the contracts of 1913 and 1920. It makes no contention that the respective rights of the parties, as defined by the contracts, to the use of the mark "Manhattan" as a label on men's wear, the field of its enjoyment and the method of its display, have been in any sense altered by mutual consent. The contracts are conceded to possess today as full a measure of whatever vigor the law allows to them as they possessed when the parties entered into them.

The complainant denies, however, that the contracts ever had any validity in law. It contends therefore that the defendant cannot now, any more than originally, take refuge under their provisions as a protection against the complainant's charge that the word "Manhattan" as a mark on men's garments is within the exclusive proprietorship of the complainant. The sole answer which the complainant makes to the defendant's claim that the complainant has expressly agreed that it, the defendant, might use the mark in the manner it does is, that the agreements it made with the defendant were in fraud of the public, were therefore illegal and such as courts of equity will disregard. There can be no estoppel, argues the complainant, based on a contract which is illegal.

It is in order first, then to examine this question of illegality. The first contract was entered into on September 23, 1913. The complainant has introduced evidence tending to show that prior to that date and as far back as 1869, a period of forty-four years, either it or its predecessors had used the name "Manhattan" on men's shirts. Except for a brief period of two or three years, to be exact

between 1879 and 1881 or 1882, the complainant's label was identified exclusively with men's negligee and dress, or outer, shirts. Except for the short period mentioned, the complainant's word "Manhattan" was in no sense associated by the trade or public with underwear. That the mark when used on outer shirts was identifiable with the complainant and when so used entitled to be protected from encroachment on the part of others, is to be taken as a fact (without deciding it) at this stage of the case, whatever may be the truth of the matter in the light of such further evidence as the defendant may produce in the event of a resumption of the hearing. Now that being so, the complainant argues that the use by another of its well known label of "Manhattan" prior to 1913, when the first contract was entered into, as a mark or label on articles of men's wear which are related to shirts, such as underwear, was a deceptive one, calculated to deceive the public into believing that the related articles were derived from the same source as were the well known "Manhattan shirts," and that the intruding user was subject to be enjoined from further use of the word on such garments. In support of this proposition the complainant cites the following among other cases: *Akron-Overland Tire Co. v. Willys Overland Co.,* (C. C. A.) 273 F. 674, affirming (D. C.) 268 F. 151; *Wall v. Rolls-Royce of America, Inc.,* (C. C. A.) 4 F. (2d) 333; *Rosenberg Bros. & Co. v. Elliott,* (C. C. A.) 7 F. (2d) 962; *Florence Mfg. Co. v. J. C. Dowd & Co.,* (C. C. A.) 178 F. 73; *Anheuser-Busch v. Budweiser Malt Products Corp.,* (C. C. A.) 295 F. 306; *Hudson Motor Car Co. v. Hudson Tire Co.,* (D. C.) 21 F. (2d) 453. These cases sustain the doctrine for which they are cited, viz., that established trade-names and marks are entitled to be protected against exploitation by others even though the precise sort of articles to which they are affixed by such others are not made or dealt in by the original appropriator of the name, provided the articles put out by the offender are so allied or related to those put out by the original appropriator of the

name that the public will be likely to be confused and deceived into attributing the new articles to the same origin as the established ones.

This principle constitutes the first step in the complainant's argument by which it seeks to demonstrate the illegality of the contract of 1913. The principle is appealed to as establishing the contention that the defendant had no right to use the mark prior to 1913 when the first contract was made. The next step in its argument is this—that the law pronounces it to be a fraud on the public for the proprietor of a trade mark or name to contract with another that the mark may be used on the goods of such other maker, for such use is tantamount to a false representation that the goods of the other are derived from the source with which the mark is reputed to be identified. A contract which thus results in deception of the public is said by the complainant to be contrary to public policy and therefore illegal and unenforceable. In their effort to persuade the court that this principle is applicable to such a state of facts as the pending case presents, the solicitors for the complainant have cited numerous cases, to which I shall presently make reference and show why in my judgment they are not pertinent as authorities in this case.

Before referring to those cases, the following observations should be made respecting the facts and certain principles of law applicable thereto. From 1869 the "Manhattan" label had been known to the men's furnishing trade. Down to 1905 (during an unimportant interval of two or three years, which ended in 1882) it was associated exclusively with men's outer shirts. Starting with 1905 it came to be associated also, due to the defendant's business, with men's underwear. It continued so to be associated when the contract of 1913 was entered into. During the eight years from 1905 to 1913, therefore, the word denoted a particular source of origin for both outer shirts and underwear. The sources, however, were different. So long as

the complainant desired to confine its business to the manufacture and marketing of outer shirts, it appears to have raised no question as to the right of the defendant to use the word as a label on underwear. The defendant's use of the word on underwear had come to indicate a source of origin quite as positively as had the complainant's use of it on shirts. The matter of the name of the maker of goods bearing a well known label which does not disclose the maker's name is not necessarily one of moment. When the courts speak of the public's identifying the source of origin, they do not mean thereby that the purchasing public can identify the maker by his specific name or the place of manufacture by precise location. What they mean by such expression is that the purchaser of goods bearing a given label believes that what he buys emanated from the source, whatever its name or place, from which goods bearing that label have always been derived.

The fact then that "Manhattan" underwear in 1913 came from the factories of the defendant and not from the factories of the complainant where "Manhattan" shirts were made is not of itself of importance if the word whether on underwear or shirts had come to indicate a definite and constant source of origin. Prior certainly to 1912, "Manhattan" on underwear, by reason of seven years of publicity and trade, if traced back to its source would have led as positively to the defendant as the maker as the same word on shirts, if traced back, would have led to the complainant as maker.

The complainant cannot be permitted to deny this in face of the recitals in the contracts of 1913 and 1920. *Inskeep v. Shields,* 4 *Har.* 345; *Barsky v. Posey,* 11 *Del. Ch.* 153, 98 *A.* 298; *Stevens v. United States,* (*C. C. A.*) 29 *F.* (*2d*) 904. The contract of 1920 expressly commits the complainant to the truth of the fact that prior thereto when underwear was labeled with the word "Manhattan" it was recognized by the public as originating with the

defendant; and all the intendments of the contract of 1913 indicate that, as to underwear, the defendant's continued use of the label as indicating a source of origin was more extensive in right than was that of the complainant.

In the light of these contracts it is impossible to take any view of the facts other than this, viz., that a right had been matured in 1913 by practice and continued enjoyment by each of these parties to the use of the word "Manhattan" as a mark on certain distinct types of men's garments. Their rights were founded on user and had not arisen by transfer from one to the other. Each had appropriated for its own particular line of goods this term of geographic description as a designating mark. When the complainant sought to step over upon the defendant's line in 1912, it undertook to appropriate a portion at least of that area covered by the word "Manhattan" with which the defendant had by its activities become identified; and now by its bill the complainant seeks to exclude the defendant from the area, entirely.

It is the element of confusion of the public and therefore the public's alleged deception, which the complainant relies upon as establishing the illegality of the contracts. But the complainant, I think, is in error in the significance which it conceives the law to attribute to this element of confusion. It is quite true that confusion in the public mind is an element necessary to be shown before any relief can be afforded to a private party for the protection of a common law trade mark. Such proof is necessary only because otherwise the complainant cannot be said to have suffered any injury. The protection of the public in such case is only an "incident of the enforcement of a private right." It was so stated in *Federal Trade Commission v. Klesner*, 280 *U. S.* 19, 50 *S. Ct.* 1, 3, 74 *L. Ed.* 138, 68 *A. L. R.* 838, where the jurisdiction of the Federal Trade Commission was denied to entertain a controversy between individuals over the right to use a trade mark on the ground that the matter

was not one of "interest to the public." In *American Washboard Co. v. Saginaw Mfg. Co., (C. C. A.)* 103 *F.* 281, 285, 50 *L. R. A.* 609, it was said, "the private right of action in such cases is not based upon fraud or imposition upon the public, but is maintained solely for the protection of the property rights of complainant." To the same effect are *Royal Baking Powder Co. v. Federal Trade Commission, (C. C. A.)* 281 *F.* 744; *Mosler v. Ely-Norris Co.,* 273 *U. S.* 132, 47 *S. Ct.* 314, 71 *L. Ed.* 578; *Armstrong Cork Co. v. Ringwalt Linoleum Works, (D. C.)* 235 *F.* 458; *Id., (C. C. A.)* 240 *F.* 1022; *National Picture Theatres v. Foundation Film Corp., (C. C. A.)* 266 *F.* 208; *Connecticut Tel. & Elec. Co. v. Automotive E. Co., (D. C.)* 14 *F.* (2d) 957; *Rosenberg Bros. & Co. v. Elliott, (C. C. A.)* 7 *F.* (2d) 962; *Borden Ice Cream Co. v. Borden's Condensed Milk Co., (C. C. A.)* 201 *F.* 510.

The courts have not in the interest of the public gone so far as to say that marks and labels can never be used under any circumstances if confusion be thereby occasioned by the rival users. The determining factor appears to me to be, not primarily whether confusion of the public has been occasioned, but rather whether the conduct of the defendant has been shown to be such as to enable him wrongfully to acquire a benefit, because of the confusion, to the injury of the complainant.

"The purpose of the law in the protection of trade-mark rights is to conserve the good will of the owner's business, indicated by the use of the mark, rather than to protect the purchasing public against the imposition of buying goods believed to be of an origin different from their actual origin." *Joseph Schlitz Brewing Co. v. Houston Ice & B. Co., (C. C. A.)* 241 *F.* 817, 820.

In the following cases confusion of the public was apparent, but the courts deciding them found no warrant, in the interest of the public, to remove it. *Delaware & H. Canal Co. v. Clark,* 13 *Wall.* 311, 20 *L. Ed.* 581; *Andrew Jergens Co. v. Woodbury, Inc., (D. C.)* 273 *F.* 952, affirmed,

(*C. C. A.*) 279 *F.* 1016; *White Rock Mineral Springs Co. v. Akron Beverage & Cold Storage Co.*, (*C. C. A.*) 299 *F.* 775; *Joseph Schlitz Brewing Co. v. Houston Ice & B. Co., supra; French Republic v. Saratoga Vichy Co.*, 191 *U. S.* 427, 24 *S. Ct.* 145, 48 *L. Ed.* 247; *France Milling Co. v. Washburn-Crosby Co.*, (*C. C. A.*) 7 *F.* (2d) 304. Not only so, but a contract between parties who had previously been making use of the same word as a mark on competing or related products, whereby the respective rights of the parties to the use of the common word were defined, has been recognized as binding on the parties, notwithstanding the public may be confused thereby. *Waukesha Hygeia, etc., Co. v. Hygeia, etc., Co.*, (*C. C. A.*) 63 *F.* 438; *American Crayon Co. v. Prang Co.*, (*C. C. A.*) 38 *F.* (2d) 448. In principle those cases are similar which hold that rights in a name may be acquired by a rival because of the first user's acquiescence, and the courts will recognize them notwithstanding they may cause confusion in the public mind. *French Republic v. Saratoga Vichy Co., supra; White Rock Mineral Springs Co. v. Akron B. & C. S. Co., supra; France Milling Co. v. Washburn-Crosby Co., supra.* The defendant's right to use "Manhattan" on its men's underwear is fortified not only by contract since 1913, but as well by acquiescence for eight years prior to that date.

I can see nothing in the facts of this case as they existed both before and after the contracts which the law condemns as so offensive to public policy as to justify the declaration that the contracts are void on the ground of illegality. Originally purchasers may have thought that "Manhattan" underwear was made by the same people who made shirts bearing that name. The complainant, if it felt itself aggrieved by the Reis Company's use of the name, could have acted to enjoin it. Whether it could have succeeded at the outset in establishing its right to an exclusive appropriation of that geographic term in connection with all men's wear, whether on outer shirts or on articles related to or associated with shirts as well, is a question which need

not now be considered. The important thing is, it did not object. On the contrary, as time went on it not only admitted the defendant's right but agreed that as against the defendant its own right to use the word on men's underwear was limited, for it is to be noted that the first contract, while conceding the defendant's right to use the name in effect upon all such garments, confined the complainant's right to its use to a restricted class of such garments.

I now take up for brief review the cases cited by the complainant in support of its proposition that the contracts are illegal as in fraud of the public and therefore void.

*Bloss & Adams v. Bloomer,* 23 *Barb* (*N. Y.*) 604, 610. In that case the plaintiff sued for damages on a contract which it made with the defendant whereby the defendant was to put seeds of good quality in paper bags bearing the plaintiff's label and market them to the public in that dress. The court refused to recognize the contract as legal because it was a contract which sought to work an "imposition upon the public to palm off spurious goods under cover of genuine labels and devices," and therefore against public policy. The case of *Warshow v. A. Elwood & Son,* 83 *Conn.* 430, 76 *A.* 531, is of the same type. In that case it was sought to recover on a contract, the object of which was to cheat the public by a scheme whereby the plaintiff was to supply the defendant with paints, etc., and the defendant was to label the same with the names of well known manufacturers and then auction them off as pretended "bankrupt stock." *Materne v. Horwitz,* 101 *N. Y.* 469, 5 *N. E.* 331, is of the same type. So also are *Church v. Proctor,* (*C. C. A.*) 66 *F.* 240, and *Manhattan Medicine Co. v. Wood,* 108 *U. S.* 218, 2 *S. Ct.* 436, 27 *L. Ed.* 706; and allied thereto in principle is *Amalgamated Furniture Factories, Inc., v. Rochester Times-Union, Inc.,* 128 *Misc.* 673, 219 *N. Y. S.* 705, in which the court refused to assist the plaintiff in its effort to compel the defendant to publish advertisements containing untrue and deceptive statements. In § 577 *of Volume* 2 *of Restate-*

*ment of the Law of Contracts, American Law Institute,* is found the following—"A bargain, performance of which would tend to harm third persons by deceiving them as to material facts, or by defrauding them, or without justification by other means, is illegal." See, also, 3 *Williston on Contracts,* § 1738. The foregoing cases are illustrative in one way or another of the application of this principle. Other cases cited by the complainant in the present connection are cases in which it is held that an attempt by contract to assign a trade mark in gross or an attempt to license the use of a trade mark by another unaccompanied by a transfer of the assignor's business, is held to be violative of public policy; the reason being that a trade mark cannot be treated as a property right separate and distinct from the business and good will with which it has grown to be associated. The complainant's cases to this effect are *Falk v. American West Indies Trading Co.,* 180 *N. Y.* 445, 73 *N. E.* 239, 1 *L. R. A.,* (*N. S.*) 704, 105 *Am. St. Rep.* 778, 2 *Ann. Cas.* 216; *Seeck & Kade, Inc., v. Pertussin Chemical Co., Inc.,* 235 *App. Div.* 251, 256 *N. Y. S.* 567; *Lea v. New Home Sewing Machine Co.,* (*C. C.*) 139 *F.* 732; *Macmahan Pharmacal Co. v. Denver Chemical Mfg. Co.,* (*C. C. A.*) 113 *F.* 468; *Detroit Creamery Co. v. Velvet Brand Ice Cream Co.,* 187 *Mich.* 312, 153 *N. W.* 664; *Kellogg v. Kellogg Toasted Corn Flake Co.,* 212 *Mich.* 95, 180 *N. W.* 397.

Such are the cases cited by the complainant as authority to sustain its contention of illegality. That they are not applicable to the situation which the facts and the agreements in the present case present is apparent. There has been no attempt by contract in this case to deceive the public. That happened which is not at all uncommon, namely, two manufacturers found themselves using a common geographical name as a mark or badge for their respective goods, each of the same general class but of different species. This was without concert or agreement between them. It continued over a space of at least seven years, and no objection was raised. When in the eighth year

the complainant enlarged its use of the name to cover goods of the species that the defendant had theretofore marketed under the name, a controversy arose, litigation ensued and the first contract was then entered into in settlement of the controversy. That contract, as well as the one of 1920, was not an instrument intended to serve the parties as a scheme for confusing the public, as in some of the cited cases. The whole purpose of the two contracts was to obviate as much as possible any confusion in the public mind by setting boundaries to the limits of the use which each should observe. Such was plainly the purpose of the original agreement of 1913; and the contract of 1920 sought further to obviate possible confusion by defining with yet more definiteness the respective rights of the parties in the use of the name, and at the same time providing that when the Reis Company used the word it should be used only in block letters and not in script form, which was the complainant's manner of displaying it. The cases cited at an earlier place in this opinion, when they do not expressly endorse such agreements as honest and commendable, impliedly give them an approving countenance.

Further distinguishing this case from the cases cited by the complainant, it should be said that this one is not a case where there has been an attempt to assign a trade name without a transfer of the business and good will to which it is appurtenant; nor is it a case where a trade mark, name or label is being used on goods whose origin is totally disconnected with the source with which the mark, name or label is commonly associated, and is thus being used to cheat the public.

I can find nothing in the authorities cited by the complainant which denounces the contracts as illegal and therefore not binding on the complainant. On the contrary, the authorities found cited at an earlier point in this opinion and the discussion upon them there indulged in, are convincing that the contracts are valid and that the complain-

ant cannot be permitted to prevent the defendant from enjoying its rights thereunder. I conclude therefore that the complainant is estopped by its contracts from maintaining its bill.

Some evidence was introduced tending to show unfair competition on the part of some of the retailers of the "Manhattan" underwear put out by the Reis Company. This consisted of a manner of advertising in such way as, it was argued, was calculated to make the public believe that the Reis underwear bearing the name "Manhattan" was manufactured by the complainant. The advertisements appeared in newspapers. But neither the defendant nor the intervenor sponsored the advertisements. The intervenor had no knowledge of them. It is therefore unnecessary for me to comment further with respect to this aspect of the evidence.

The bill should be dismissed, costs on the complainant.