THE COCA-COLA COMPANY, a Corporation of the State of Delaware,

Defendant Below, Appellant,

*vs.*

NEHI CORPORATION, a Corporation of the State of Delaware,

Complainant Below, Appellee.

*Supreme Court, On Appeal, Jan. 4, 1944.*

LAYTON, C. J., RICHARDS, RODNEY, SPEAKMAN, and TERRY, JJ., sitting.

*Hugh M. Morris* and *Daniel O. Hastings,* (John A. Sibley, Marion Smith, and Joseph M. Collins, of Atlanta, Ga., and James H. Rogers, of Chicago, Ill., of counsel), for appellant.

*Robert H. Richards, Caleb S. Layton,* of the firm of Richards, Layton & Finger (Theodore Kiendl and Ellis W. Leavenworth, both of New York City, C. L. Parker, of Washington, D.C., and Willis Battle, of Coumbus, Ga., of counsel, for appellee.

LAYTON, Chief Justice, delivering the opinion of the court:

Long prior to 1886 the stimulating qualities of preparations made from leaves of the Coca, a South American shrub, and from the nut of the Cola tree, native to Africa, were well known to pharmacopolists. In or about that year individual predecessors of the complainant introduced to the public a non-alcoholic carbonated beverage of peculiar aroma and taste to which the name "Coca-Cola" was given as descriptive of the extracts made from Coca leaves and the Cola nut which it contained. The beverage was advertised, not only as a refreshing drink, but also as a cure for sick headache, neuralgia, hysteria, melancholy, and all nervous affections; and by extensive promotional activities constantly maintained the beverage became increasingly popular. By the time of the passage of the *Food and Drug Act of* 1906, 21 *U.S.C.A.* §§ 1-15, the stimulant derived from the coca leaves was entirely eliminated, and the caffeine present in the beverage is mainly obtained from sources other than the cola nut.

The complainant and its predecessors have used continuously the name "Coca-Cola" as a tradename and trademark; and whatever may have been the original weakness of the mark, it has long since acquired a secondary significance, and to most persons means the complainant's familiar product to be had everywhere, and not a compound of particular substances. Moreover, the trademark was registered in the United States patent office in 1893, and again under the ten year proviso of the *Trademark Act of February* 20, 1905, 15 *U.S.C.A.* § 81, *et seq.* The trademark has also been registered under the laws of this State. The complainant's exclusive right to the use of the trademark

is unassailable, and is not disputed. *Coca-Cola Co. v. Koke Co. of America, et al.*, 254 *U.S.* 143, 41 *S. Ct.* 113, 65 *L. Ed.* 189. It is to be protected not only against exact reproduction, but also against colorable imitation. *Thaddeus Davids Co. v. Cortlandt I. Davids, et al.*, 233 *U.S.* 461, 34 *S. Ct.* 648, 58 *L. Ed.* 1046.

The complainant's syrup has always been made under a secret formula, but the product was never protected by patent, and it is not surprising that many have attempted to profit, and some have profited, by the tremendous popularity of the beverage first introduced and established in public favor by the efforts of the complainant.

The defendant and its predecessors have long manufactured and sold a cola beverage, or at least, the concentrate from which the syrup is made. The defendant succeeded Nehi Inc., a Georgia corporation, in turn a successor to the Chero-Cola Co., incorporated in that State in 1912, the latter company tracing back to Hatcher Bottling Co., incorporated in Georgia in 1901.

At the time this suit was brought, the complainant offered its bottled product in a six ounce bottle at the price of five cents. The defendant's predecessor, Nehi, Inc., in response to a public demand for a larger quantity at the same price, in 1934, put on the market one of its products, under the name "Royal Crown Cola," in a twelve ounce bottle.

The two beverages, "Coca-Cola" and "Royal Crown Cola," are dark brown in color, the characteristic color of cola beverages, and the two products are quite similar in aroma and taste.

The Coca-Cola Company filed its bills of complaint in the court below to prevent infringement of its trademark, "Coca-Cola", and unfair competition with it by the defendant in the business for which the trademark is used.

The bill of complaint alleged that the complainant was engaged in the manufacture and sale of a syrup and bever-

age made therefrom under a registered trademark, "Coca-Cola", frequently abbreviated to "Coke" or "Koke" or "Cola", which trademark, as well as the abbreviations, had long been recognized by the public as indicating its product exclusively; and that the words "coca" and "cola" had been so long associated together with each other in the trademark that the use of either in the name of a beverage caused public belief that a beverage to which the words were applied was made by the complainant or by its authority, or in some way emanated from it.

It was further alleged that the Chero-Cola Company, a predecessor of the defendant, in the settlement of certain litigation with the complainant, on or about October 30, 1923, entered into a contract under seal by which it bound itself, its successors and assigns not to use the word "cola" as the name or part of the name of its product.

It was then alleged that the defendant and its predecessors had applied to their products colorable imitations of the complainant's trademark, such as "Nehi Cola", "Par-T-Pak Cola", "Royal Crown Cola" and "R C Cola"; and had engaged in numerous acts constituting unfair competition manifesting a fraudulent scheme to sell a soft drink not on its merits but by the use of the complainant's celebrity and good will.

It was prayed, *inter alia,* that the defendant be restrained from using the names "Royal Crown Cola", "R C Cola", or any other colorable imitation of the complainant's trademark; from using the word "cola", in a name under which the defendant's product is sold; from representing or suggesting the passing off of the defendant's product for the complainant's; from otherwise infringing the complainant's trademark or competing unfairly; and that the defendant be required effectually to distinguish its product from "Coca-Cola". An accounting of damages was also prayed.

The defendant, answering, admitted that it and its predecessors had continuously manufactured, advertised

and sold since 1926 a cola beverage under its registered trademark "Nehi" designating the beverage as "Nehi Cola", since 1934 a cola beverage under the registered trademark "Royal Crown", designating the beverage as "Royal Crown Cola", sometimes accompanied by the letters "R C", and since 1935 a cola beverage under the registered trademark "Par-T-Pak", designating the beverage as "Par-T-Pak Cola". It denied that the complainant's product was referred to by the public as "Cola"; and averred that the word "cola" was descriptive of and the generic name for a type or kind of non-alcoholic beverage, and meant such type or kind and not the product of the complainant or of any particular manufacturer. It denied that it was prohibited by the contract of October 30, 1923, from using the word "cola" as part of the name of its beverages; and denied all charges of unfair competition. As an affirmative defense it set up laches and estoppel arising out of the unreasonable delay by the complainant in claiming violation of its rights and in the bringing of the suit.

The Chancellor held that the complainant had no right of exclusive use of the word "cola" alone, there being no direct evidence that "Coca-Cola" was ever known as "Cola"; but on the contrary, the word was the generic term for a well known type of soft drink having a characteristic taste and color resembling "Coca-Cola", of which the complainant was but one of many manufacturers. It was further held that the names adopted by the defendant for its beverages, read as a whole, were not confusingly similar to the complainant's trademark. It was found that "Royal Crown Cola" had been repeatedly substituted for "Coca-Cola" in taverns in certain western cities when served by the glass, in some instances at suggestion of the defendant's sales agents of greater profit accruing from the larger quantity at the same price; but that such acts were without the knowledge or consent of any responsible officer of the defendant, and the tavern trade was but a small part of the

defendant's extensive business. All relief was refused, and the bill of complaint dismissed. 26 *Del. Ch.* 140, 25 *A.* 2d 364. This appeal followed.

The complainant accepts the Chancellor's statement that the basic question was whether the several names chosen by the defendant to designate its beverages were deceptively similar to "Coca-Cola"; but excepts sharply to the further statements that the question largely depended on the defendant's right to use the word "cola" in a denominative sense in marketing its products, and that the real question was whether the word was wholly artificial or one having descriptive significance. The complainant insists that the Chancellor proceeded on a false theory, and made a basically erroneous approach to the question in assuming that the complainant asserted and must establish an exclusive right to the use of the word "cola" in order to prevail; whereas, all that it had to prove in order to establish trademark infringement was that the names used by the defendant, which included a large part of the complainant's mark, were but colorable imitations of "Coca-Cola", that is, such imitations as were likely to deceive purchasers as to the origin of the defendant's products.

But, clearly, the Chancellor advanced no theory of his own, nor was his approach to the question one of his own seeking. The allegations of the bill of complaint amounted to direct assertions that the word "cola" alone had acquired a secondary meaning and, when used as a part of the name of a beverage, was bound to suggest the complainant as the source of origin, in result a claim of exclusive right to the use of the word in a name conferring sense.

It was upon this issue that the complainant introduced evidence of the results of word association tests conducted by professors of psychology in college class rooms. The Chancellor, properly gave little or no weight to this testimony; for, passing by the doubt whether such testimony was admissible at all as being inherently hearsay, and not

subjected to the test of cross-examination, it is manifest that the mental reaction of the student in the class room to the word "Cola" is bound to differ from that of the buyer in the market place when confronted with the name of the beverage and the size and dress of the bottle or package. See *Dixi-Cola Laboratories, Inc. v. Coca-Cola Co.,* (4 *Cir.*) 117 *F. 2d* 352, 353; *Coca-Cola Co. v. Chero-Cola Co.,* 51 *App.* (*D.C.*) 27, 273 *F.* 755.

The complainant also introduced thirteen local witnesses who testified that to them the word "cola" meant "Coca-Cola". This testimony would seem to be more applicable to the asserted claim of a secondary meaning acquired by the word "cola", although it is here submitted as proof of actual confusion. No witness testified that the name "Royal Crown Cola" was to him confusingly similar to "Coca-Cola", or that he was otherwise confused by a similarity in the form or dress of the bottle or package; and, however viewed, the testimony of thirteen witnesses out of millions of consumers was rightfully held to be of small importance. There always will be found inattentive and unimaginative persons; and we are unwilling to regard such witnesses as buyers of average recollection and intelligence.

It was upon this issue also that a mass of testimony was introduced by the defendant, including the history of the Cola nut, its properties and uses as an ingredient of beverages, the origin of the name "Coca-Cola", admissions by the complainant in pleadings in other actions that the name was descriptive, the extensive use by competitors of the word "cola" in the names of beverages, definitions of the word in dictionaries as meaning a drink, and recognition in government publications and by the complainant itself that there existed a class of beverage known as "cola drinks".

The complainant's position below was that there was no such thing as a cola beverage, and it introduced witnesses who professed entire incomprehension of the term. The

defendant's witnesses, in turn, were subjected to an extensive cross-examination with respect to a definitive explanation of a cola beverage; all somewhat unnecessary, for in this day the existence of a type of soft drink having a distinctive aroma, taste and color, and known as a cola beverage, is as well recognized as is the fact that there is a ginger ale or a root beer. Notoriety is the essence of judicial notice; and we see no reason why the court should pretend ignorance of that with which the general public is familiar.

The Chancellor correctly measured the question in saying that it largely depended on the right of the defendant to use the word "cola" in a denominative sense; and the argument of the complainant, however obscured, rests upon the asserted right to an exclusive use of the word as applied to the name of a beverage. If the complainant has, as it asserted in its complaint, the sole right to the use of the word, if the word, considered as an abbreviation of "Coca-Cola", has identified the product to which it is applied as emanating from the complainant, it is because the word alone has acquired through the years a secondary meaning, and therefore, any competitor making use of it in the name of its beverage necessarily infringes the complainant's mark. If appropriation of part of the complainant's trademark is to be forbidden, it is for the reason that the use of the word "cola" in the name of a beverage, no matter how distinctive the prefix may be, necessarily results in a colorable imitation of the complainant's trademark. If likelihood of confusion be made the test, the chief deceptive factor giving rise to confusion is the presence of the word "cola" in the name under which the rival beverage is sold. And if as the complainant contends, much of the evidence introduced by the defendant was inadmissible because the complainant had the undoubted right to the exclusive use of its trademark, it would be for the reason that no competitor may use the word "cola" as a part of the name of its product.

The Chancellor did not proceed upon the theory that the complainant must establish an absolute right in gross to the ownership of the word "cola". He was compelled to examine the complainant's claim of exclusive right, and having denied that claim, he proceeded to consider and determine whether the several names adopted by the defendant in selling its products were colorable imitations of the complainant's trademark.

We are in entire accord with the Chancellor's conclusions. The word "cola", as applied to the name of a beverage, is now a generic name descriptive of a type of non-alcoholic drink produced by many manufacturers. It is a word in the public domain, incapable of exclusive appropriation, and apart from special circumstances, may be freely used denominatively, provided that the name as a whole is not deceptively similar to "Coca-Cola". The names chosen by the defendant to designate its beverages bear no confusing resemblance to "Coca-Cola" whether tested by sight or by sound. The vice of the complainant's position is that it is attempting to establish a monopoly of the cola beverage under the guise of trademark infringement.

In *Dixi-Cola Laboratories, Inc., v. Coca-Cola Co., supra,* in an opinion by Judge Soper evidencing an impartial and penetrating study of the question and the exercise of a wise discretion in the public interest, it was said that no reported case had come to the court's attention which distinctly held that the word "cola" could not be used as part of the name of a beverage provided that the whole name was not confusingly similar to "Coca-Cola". There all injunctive relief was not denied because of the manifest fraudulent conduct of the appellant. *Certiorari* was denied, 314 *U.S.* 629, 62 *S. Ct.* 60, 86 *L. Ed.* 505. In *Coca-Cola Co. v. Standard Bottling Co.*, (D.C.) 50 *F. Supp.* 201, it was said that it seemed to be, or soon would be, the law, if the question ever came squarely before the Supreme Court, that the plaintiff's competitors had the right to use the word "cola" as

part of a beverage name when used with a prefix which distinguished it from Coca-Cola. And, on appeal, the Circuit Court of Appeals for the Tenth Circuit, in an opinion handed down on November 8, 1943, 138 *F.* 2d 788, said that under numerous decisions in many courts, it had been held that the appellant has no exclusive right to the use of the word "cola" standing alone or to any combination including the word "cola", except its own trademark of "Coca-Cola". In *Coca-Cola Co. of Canada, Ltd., v. Pepsi Cola Co. of Canada, Ltd.,* 1 *D.L.R.* 161, the Exchequer Court of Canada, in an infringement action, found infringement, and rendered a plenary judgment in favor of the complainant. On appeal (1938, 4 *D.L.R.* 145) the Supreme Court of Canada unanimously reversed the judgment in two separate opinions. Mr. Justice Davis observed that the plaintiff's objection really went to the registration by any other person of the word "Cola" in any combination for a soft drink; and that if the objection should be allowed, the plaintiff virtually became the possessor of an exclusive proprietary right in relation to the word "cola". On further appeal to the British Privy Council (32 *T. M. Rep.* 313; *All England Law Reports Annotated,* 1942, *Vol.* 1, 615), the Privy Council, speaking through Lord Russell of Killowen, said that dictionaries might properly be referred to in order to ascertain the meaning of a word, and also the use to which the thing, (if it be a thing) is commonly put; that by reference to dictionaries it appeared that the extract of the cola nut was used in the United States in medicinal preparations and summer drinks, and was a word in common use in Canada in naming beverages; and that it was difficult, indeed impossible, to imagine that the mark Pepsi-Cola, as used by the defendant, in which the distinctive feature was the word "Pepsi", and not "Cola", would lead anyone to confuse it with the registered mark of the plaintiff.

It is true that unfair competition was not an issue. Nevertheless, the decision upon the question of trademark

infringement is of supreme importance in that so far as the British Empire is concerned no one may now claim an exclusive right to the use of the word "cola" as applied to the name of a beverage.

We put aside the cases holding that a definite trademark or trade name containing the word "cola" constitutes a colorable imitation of the complainant's mark. *Coca-Cola Co. v. Chero-Cola Co.*, 51 *App.* (*D.C.*) 27, 273 *F.* 755, *Coca-Cola Co. v. Old Dominion Beverage Co.*, (4 *Cir.*) 271 *F.* 600, and *Nashville Syrup Co. v. Coca-Cola Co.*, (6 *Cir.*) 215 *F.* 527, *Ann. Cas.* 1915*B*, 358, are examples. Cases so holding are of importance as evidencing the opinion of the courts with respect to the deceptive similarity of a particular name, taken as a whole, to the complainant's trademark, and are not to be accepted as laying down the rule that the use by a competitor of the word "cola" in the name of a beverage is necessarily deceptive.

*Coca-Cola Co. v. Koke Co. of America, supra, Thaddeus Davids Co. v. Cortlandt I. Davids, et al., supra,* and *Armstrong Paint & Varnish Works v. Nu-Enamel Corporation,* 305 *U.S.* 315, 59 *S. Ct.* 191, 83 *L. Ed.* 195, have no particular bearing on the question. In the first of these cases, the point of the decision, as it is of concern here, was with respect to the use of the word "Koke", which was alleged to have been recognized and commonly and familiarly used by the public as a nickname for "Coca-Cola". In the second case, the complainant's trademark was "Davids". The defendant appropriated the entire mark, distinguished it only by the letters "C. I." and the words "Davids Mfg. Co." This was held to be a mere simulation of the complainant's mark constituting a colorable imitation within the meaning of the statute. In the last case, the defendant likewise appropriated the complainant's mark, "Nu-Enamel", in its entirety, and sought to distinguish its mark by interposing the word "beauty" between "Nu" and "Enamel". And this

was held to be an unfair use of the complainant's name which had acquired a secondary meaning.

In or about the year 1921, the Chero-Cola Company, a predecessor of the defendant, applied to the United States Patent Office for the registration of "Chero-Cola" as a trademark for a soft drink. The application was opposed by the complainant on the ground that it was the owner of the registered trademark "Coca-Cola" which was applied by it to the same kind of drink. The Examiner of Interferences sustained the opposition, but was reversed by the Commissioner of Patents. Upon appeal to the Court of Appeals of the District of Columbia, the decision of the Commissioner was, in turn, reversed. The court examined minutely the two names, and was of opinion that the image which one mark painted on the mind was not clearly different from that made by the other mark. *Coca-Cola Co. v. Chero-Cola Co., supra.*

The Chero-Cola Company then filed its bill of complaint in the United States District Court for the Northern District of Georgia to authorize the Commissioner of Patents to register the trademark, "Chero-Cola". The Coca-Cola Company filed an answer to the complainant and a counterclaim charging unfair competition and infringement of its trademark "Coca-Cola".

It was in this setting that the agreement of October 30, 1923, was made.

The material part of the agreement reads:

"The consideration of this agreement is the settlement of the claims and controversies involved in the litigation now pending in the United States District Court for the Northern District of Georgia, and in the Supreme Court of the District of Columbia; and it shall be binding upon the successors and assigns of both parties; however, nothing herein shall be construed as an admission of the contentions by either party to the claims made in the pleadings in said causes.

"It is agreed:

"1. That the Chero-Cola Company shall desist, except to the ex-

tent hereinafter set forth, from the use of the words, either hyphenated or unhyphenated, 'Chero-Cola' and 'Cherry-Kola'.

"2. That the cases now pending between the Chero-Cola Company and The Coca-Cola Company in the United States District Court for the Northern District of Georgia and The Coca-Cola Company v. Rentz, now pending in the Supreme Court of the District of Columbia, shall be dismissed without prejudice. The taxable cost of both of said litigations shall be aggregated: The Coca-Cola Company shall pay one-half and the other parties to said proceeding the remainder.

"3. (a) The Chero-Cola Company may continue to sell and ship indefinitely, under the name 'Chero-Cola' and 'Cherry-Kola' not exceeding Fifteen Hundred ($1,500) Dollars annually in the aggregate in amount of its product for the purpose of protecting against others than The Coca-Cola Company whatever right it may have in such names. The Chero-Cola Company will inform The Coca-Cola Company, on demand, to whom such shipments, as shown within this clause of this contract, have been made.

"(b) The Chero-Cola Company may continue to use the name 'Chero-Cola' and 'Cherry-Kola' for a period not exceeding four years from January 1, 1924, within which period it shall proceed to select and adopt some other name as a trademark; said new name shall not so resemble Coca-Cola as to be likely to cause confusion or mistake in the mind of the public or to deceive purchasers.

"In no event is the single word 'Chero' or 'Cheero' reproduced in type other than the familiar script in which Coca-Cola is reproduced, to be considered as a colorable imitation; nor is there to be any objection to the Chero-Cola Company using the single word 'Chero' or 'Cheero' (or other name or trademark permissible under this contract), displayed as a brand, with the designation 'A Cola Beverage' or 'Formerly Chero-Cola' or 'A Perfect Cola Beverage', or words of similar import, provided that in no event shall any of the above be reproduced, in the familiar script in which 'Coca-Cola' is reproduced, and provided further if the designations as above outlined are used, they shall be subordinated to the name to be adopted by the Chero-Cola Company; and further, they shall not be susceptible of use as the name or part of the name of the product of the Chero-Cola Company".

The complainant insists that the agreement clearly and unequivocally prohibits the defendant from the use of the word "cola" in the name of its product. At the same time it contends that read in the light of the claims and controversies involved in the litigation pending between the

parties, and the then status of the trademark and unfair competition law, the agreement should be so construed, admitting, as it seems, that the agreement was in some degree ambiguous.

The defendant, likewise, contends that the agreement does not prohibit it from using the word "cola" in the name of its product, and is without ambiguity; but, it argues that if there is aught of ambiguity in the language, it is dissolved by a consideration of the circumstances surrounding the making of the agreement and the practical construction put upon it by the parties.

The core of the controversy is the paragraph lettered (b) of the numbered paragraph 3.

The complainant contends that paragraph (b) contains a general and a particular covenant, the first found in the last clause of the first paragraph of (b), the second in the last clause of the succeeding paragraph, which is clearly not provisional. The argument is that the first is a general covenant prohibiting the selection of a name amounting to a colorable imitation of the trademark "Coca-Cola", the second, a particular and definitive preclusion of the use of the word "cola" as a part of the name of a product of the Chero-Cola Company.

In the light of the claims and controversies involved in the pending litigation, the complainant insists that the root of the controversy lay in the use of the word "cola" in the name; and the record contains the pleadings in full, the complaint, the answer and counter-claim.

The defendant contends that the paragraph (b) contains, in reality, but one covenant, which is that the Chero-Cola Company shall select a new name that will not be a colorable imitation of the trademark "Coca-Cola"; and it argues that the last clause of the second paragraph of (b) is plainly provisional, its object and purpose being to free the Coca-Cola Company, in specified circumstances, from

its general agreement not to object to a name selected by the Chero-Cola Company, so that, as the defendant is using the word "cola" as part of the names of some of its beverages, the complainant is at liberty under the contract to object to the use of the word in the name. It insists that the last clause must be read as though the word "provided" followed the word "further", and contends that the law is well settled that the word "provided" will always be taken to indicate a condition unless from the context it clearly appears that the parties intended a covenant. 50 *C. J.* 831; *Rich v. Atwater,* 16 *Conn.* 409.

The arguments do not dissolve the doubt. Plainly, as we view it, the last clause should be read as though "further" was followed by "provided"; but whether it was the intent of the parties that the clause should not constitute a covenant against the use of the word "cola" in the name of a product of the Chero-Cola Company is not so certain. Standing alone, the last clause of the first paragraph of (b) is clearly understandable; and, likewise, by itself, the last clause of the second paragraph points to a prohibition of the use of the word "cola" in the name of a product. The presence of both clauses creates an ambiguity.

The pleadings in the Georgia litigation very plainly do not show that the root of the controversy was the use, in itself, of the word "cola" in the name adopted by the Chero-Cola Company. The decision of the District of Columbia Court of Appeals was not based on that ground. Nor do we think that the then existing status of trademark and unfair competition law throws light upon the intention of the parties.

If the root of the controversy was the use of the word "cola" in any combination, and the agreement had been intended to prohibit the use of the word in the name of a product of the Chero-Cola Company, that intention and purpose could have been expressed in simple language and in a few words. It is not easy to agree that two accomplish-

ed lawyers, each familiar with the issues involved in the litigation, would have found difficulty in agreeing upon the language of a prohibiting covenant if the controversy centered on the use of the word "cola" in a denominative sense.

We pass by, as of doubtful probative effect, the evidence that in two of fourteen preliminary drafts of the agreement, the word "CheroKola" was found to be acceptable. But the practical construction given to the agreement as shown by the attitude of the parties is pertinent and significant.

The agreement was entered into in the latter part of 1923. In 1926, the defendant, or its predecessor, began to market a cola beverage under the name "Nehi Cola". This seems to have been done openly, and the complainant certainly became aware of the fact in 1929. There are in the record letters from the complainant's general counsel to the defendant's licensed bottlers in Louisville, Kentucky, and Nashville, Tennesee, written in September and December, 1929, copies of which were sent to the defendant's then president. The bottlers were told that they were bottling a product under the name "Nehi-Cola" and were substituting this product for "Coca-Cola", and that the use of the name "Nehi-Cola" constituted infringement of the complainant's trademark. The first complaint, if based on fact, was justified in any circumstances. The second complaint was the bare assertion of a claim in the absence of some extraneous agreement; and the agreement of October 30, 1923, was not mentioned in the letters to the bottlers, nor does it appear that the complainant ever called the defendant's attention to the agreement. In 1934, the defendant began to manufacture, advertise and market "Royal Crown Cola", and, in 1935, "Par-T-Pak-Cola". No objection or complaint was made that the defendant was violating the agreement until this suit was brought; and we have the fact that for years the defendant had been using the word "cola" in the names of its beverages without its generally alert rival calling its

attention to its supposed covenant not to use the word "cola" as a part of the names of its products.

Precisely what the respective lawyers for the contracting parties had in mind is, perhaps, impossible to know. The picture is one of two able and wary lawyers, each intent to secure the utmost advantage for his client, and, perhaps, agreeing upon language in concealment of thought; but whatever the exact object and purpose of the disputed part of the agreement, we are satisfied that the minds of the parties never met in agreement, that the defendant's predecessor and its successors were to be prohibited from using the word "cola" in the name of a beverage, if the name, as a whole, was not colorable imitation of "Coca-Cola".

Finally, the complainant contends that the defendant competed with it unfairly in advertising and selling its product, "Royal Crown Cola", and it assigns as error the failure of the Chancellor to consider and give effect to the defendant's acts as an integrated whole. These acts, it is said, constituted subtle, but deliberate, fraud evidencing an intent to trade upon the complainant's good will, and as the material facts are not in dispute, the question must be determined as a matter of law.

The facts upon which the argument is based are, the use by the defendant of one-half of the complainant's trademark in the name of a beverage similar in color and taste to "Coca-Cola"; insufficient disclosure of the source of manufacture of the defendant's product; imitation of the complainant's color schemes in its advertising signs; equivocal promotional statements; false statements with respect to the use of cola nut extract a flavoring essential; comparative blind tests of the rival beverages; and suggestions that the defendant's nearly identical product could be successfully and profitably palmed off for "Coca-Cola".

Competition in trade is universal and entirely proper in the public interest. One has the right fairly and honestly to enter an established field no matter what the effect on

the business of another. Sharing the good will of a product created by the skill and judgment of another, the market for which has been extended by large and persistent advertising expenditures, is not, of itself, unfair. *Kellogg Co. v. National Biscuit Co.*, 305 *U.S.* 111, 59 *S. Ct.* 109, 83 *L. Ed.* 73. The essence of unfair competition is the fraudulently seeking to sell one's goods for those of another, and the true test is whether the defendant's acts are reasonably calculated to deceive the average buyer under the ordinary conditions prevailing in the particular trade. Actual fraud or evil intent is not necessarily essential to injunctive relief where the natural and probable tendency of the defendant's conduct is to deceive the public; but the likelihood of deception must be reasonably probable and not merely speculative, and it is to be presumed that the public will use its senses and take note of differences in names and appearances. One entering into an already occupied field must take care to avoid unnecessary adoption or imitation of a confusing name, label or dress of goods; but owing to the nature of the merchandise dealt in, or to the common use of terms which are in the public domain, some confusion or damage may be unavoidable.

The acts of the defendant, considered severally and as a whole, must be examined in the light of these well established principles.

The word "cola" is used denominatively by many manufacturers of cola beverages; and unless those who, as of right now, so use the word are to be granted a monopoly of the use, the employment of the word in a name conferring sense by a new comer is not only reasonably necessary, but also, in a large sense, compulsory, if competition on even terms is to be permitted.

The aroma, taste and color of the rival beverages are characteristically similar; but the complainant enjoys no monopoly by way of patent. The cola beverage, including the coloring matter, is free to all who can make it in the

absence of extraneous deceptive elements; and, in the public interest, fair and honest competition ought not to be suppressed or impeded. *Coca-Cola Co. v. Koke Co. of America, et al., supra; Coca-Cola Co. v. Williamsburgh Stopper Co. (D.C.S.D. New York, 1912) 2 T. M. Rep.* 234.

It is doubtful whether a cola beverage of a different color could be successfully marketed; and, at the least, it can be said that the defendant, in giving to its product the almost universally adopted color, has caused no unnecessary confusion in the trade or among the consuming public.

It is contended that the small amount of cola extract in the defendant's product is entirely insufficient to affect its flavor, and is used only as a subterfuge to excuse the presence of the word "cola" in the name of the defendant's beverage. This complaint lacks substance. It seems that the quantity of the extract, for whatever purpose used, was much the same in the competing beverages, and at the trial the complainant did not regard the fact as material. Moreover, from the testimony, we are unable to say that the extract, as used by the defendant, was not a flavoring essential.

The evidence does not warrant the conclusion that the defendant, in its advertising activities, concealed, or attempted to conceal, the origin of its product. The trademark, itself, is a mark of origin, the sign manual which serves to identify and distinguish the goods. Identification by the public of the source of origin is not ordinarily by specification of name, or place of manufacture by exact location. *Manhattan Shirt Co. v. Sarnoff-Irving Hat Stores, Inc.,* 19 *Del. Ch.* 151, 164 *A.* 246, affirmed 20 *Del. Ch.* 455, 180 *A.* 928. In some of the defendant's radio broadcasts and newspaper advertisements the name of the defendant as the producer of "Royal Crown Cola" did not appear, but in the great majority of them, the defendant was clearly identified. The name "Royal Crown Cola", or "R. C. Cola", was clamorously dinned into the ears of the listening public. Even a

sluggish mind would understand that some cola beverage other than "Coca-Cola" was being offered to the public.

Objection is made to the statement which frequently was made in the defendant's radio broadcasts, that "Royal Crown Cola" was blended by a company engaged for a quarter of a century in blending fine cola beverages; and also with respect to the defendant's imitative characterization of its beverage as refreshing and delicious. The thought seems to be that the first statement would probably be accepted by the public as pointing to the complainant, it having been pre-eminent and first in the field; and that the borrowing of the complainant's use of laudatory terms would tend to deceive the public. The objection in these respects is overwrought. We may suppose that the defendant's beverage is of average excellence. There can be no monopoly of the use of common adjectives, and the beverage trade very generally makes use of the puffing terms "delicious" and "refreshing". There was no evidence that any buyer had been confused by the statements complained of; nor do we think that deception would follow from them as a natural and probable consequence.

There are but few primary colors suitable for advertising purposes. Advertising agencies almost universally employ in combination the colors red and white. This is well known even to the careless observer, and it is doubtful whether the combination has particular significance. The respective color schemes were somewhat alike, but there were marked differences. The details need not be stated. It is sufficient to say that no fraudulent imitation of the complainant's advertising schemes was shown. Simulation by the complainant of the defendant's designs could as well be argued. In this connection it may be said also that the complainant offers its bottled product in a six ounce bottle, of somewhat unusual shape, and with lettering blown in the glass. The defendant markets its product in a twelve ounce clear glass bottle with a distinctive labeling. The

respective bottles differ widely in shape, size and marking; and, generally, in its labels and advertising the defendant has avoided the use of the script and flourishes adopted by the complainant.

A combination of acts, each of them severally lawful, may, it is true, result in unfair competition, but in such case an underlying intent to perpetrate a fraud on the public must clearly appear; and here the outline of fraudulent purpose, or natural and probable tendency to deceive, if discernable at all, is but shadowy.

The defendant's sales agents stressed the fact that the defendant company offered as good, or a better, cola beverage in twice the quantity for the price of "Coca-Cola"; offered to make, and did make, what is called a "blind test" of the two products. We see nothing legally or ethically wrong in such selling activities, unless accompanied by suggestions of palming off of the defendant's product for that of the complainant. As any other producer the complainant, in free enterprise, must meet competition, and that of the sharpest kind. All that it can rightfully insist upon is that the competition be fair. If the defendant can make and sell twice the quantity of the cola beverage of equal excellence and at the same price of the complainant's product, we see no reason why a doubtful public may not be convinced by demonstration.

There was evidence that when "Coca-Cola" was ordered to be served by the glass or as a base for alcoholic drinks in taverns in certain Western cities, "Royal Crown Cola" was repeatedly substituted, in some instances upon the suggestions made by the defendant's sales agents of greater profit resulting from the larger quantity at the same price. This evidence was sharply disputed. The defendant produced a number of its salesmen who emphatically denied suggestions of substitution; and fifteen of the defendant's licensed bottlers from various parts of the country testified that no complaint of unfair competition had ever been made

to them either by the complainant itself or by its bottlers. Moreover, there was direct evidence reflecting most seriously upon the veracity and integrity of some of the complainant's chief witnesses.

We are not disposed to question the Chancellor's finding of fact; but he also found from undisputed testimony that no responsible officer of the defendant had ever authorized such acts of its salesmen; and it clearly appeared that the defendant had never been informed of these acts, and had no knowledge of them prior to the trial of the case. The question is not, that the defendant is not responsible for the acts of its agents done in the course of their employment, but rather, whether in all of the circumstances of the case, injunctive relief should be granted.

The complainant insists that the defendant, in making a product so similar to "Coca-Cola", afforded the opportunity to its sales agents to suggest, and unscrupulous retailers to accomplish, substitutions; and that in all of the circumstances appearing the defendant was bound to know, and must be held to have known, of the acts of its agents. The question would seem to hinge on whether the defendant, mindful of conditions prevailing in the business, was bound to anticipate that its agents would stoop to unlawful practices, and had failed to take sufficient precautions against such occurrences. Anticipation of harm to another resulting from an act of commission or omission is a familiar concept in the law of negligence; but, ordinarily, *mens rea* is not inferred. Undoubtedly the seller of almost any cola beverage has the opportunity to suggest the palming off of his product for that of a rival; but the general presumption is that one will act honestly and lawfully, and not fraudulently, and an unlawful or knavish act is not ordinarily to be anticipated. Moreover, the complainant, as it easily could have done, did not inform the defendant of the unlawful practices of its salesmen, and no opportunity was offered it to correct the evil. In these circumstances of general fair

trade practice on the part of the defendant, and lack of knowledge, actual or imputed, of the particular unfair practices on the part of its agents, the defendant ought not to be held guilty of fraud and its business disrupted to the consequent loss of the investors in the enterprise by an injunction either prohibiting the use of the word "cola" in the name of its products, or giving to them the characteristic color.

In the absence of evidence showing a reasonable probability of other or further improper acts on the part of the defendant's agents, injunctive relief in that particular was not necessary.

So far as the evidence discloses the complainant's damage, attributable to the wrongful acts of the defendant's salesmen, was small. In the defendant's brief of argument is the uncontradicted statement that the equivalent of about three hundred bottles of the defendant's product had been passed off for "Coca-Cola", and this over a period of some length. The time, trouble and expense of an accounting of such small damage would far outweigh any resulting benefit to the complainant. 63 *C.J.* 573.

The decree of the Chancellor is sustained.