Florence PORTER, Executrix of the Estate of Wellington W. Porter, and Porterway Harvester Manufacturing Company, Inc., Plaintiffs,

v.

FARMERS SUPPLY SERVICE, INC., Defendant.

Civ. A. No. 84–527 CMW.

United States District Court, D. Delaware.

Aug. 7, 1985.

Arthur G. Connolly, Jr., of Connolly, Bove, Lodge & Hutz, Wilmington, Del. (Charles S. McGuire, Syracuse, N.Y., of counsel), for plaintiffs.

Donald F. Parsons, Jr., and Jack B. Blumenfeld, Esquire of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendant.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

This action for patent and trademark infringement arises out of Farmers Supply Service's (hereinafter "Farmers Supply") sale of replacement disks (or puller blades) for Porterway Tomato Harvesters which are manufactured by Porterway Harvester Manufacturing Co. (hereinafter "Porterway"). The patent in question—Patent No. 3,999,613 (hereinafter " '613 patent")—was issued to Wellington Porter under the title "Tomato Harvester Header." The '613 patent contains a series of combination claims describing a harvester header and the header's use in combination with the Porterway Tomato Harvester. The present action is prosecuted by Porterway and the executrix of Mr. Porter's estate. The plaintiffs' complaint alleges four causes of action against Farmers Supply: patent infringement, federal trademark infringement, federal unfair competition, and unfair competition under state law. Defendant has moved for summary judgment on all counts.

## BACKGROUND FACTS

Since incorporation in 1957, Porterway has engaged in the design and manufacture of farm harvesting equipment for a veritable cornucopia of vegetable types including peas, spinach, lima beans, asparagus, pumpkins, cucumbers, brussels sprouts and tomatoes. The Porterway Tomato Harvester, which is a single row tomato harvester, is one of Porterway's most commercially successful machines, accounting for nearly 70% of the company's gross revenues over the past ten years according to Porterway's own estimates.

The machine itself is not especially complicated. It consists of three major structures—a header, a conveyor section and a main frame. These three structures are in turn made up of smaller components and sections.

The header mechanism is found at the front of the machine. It consists of two counter-rotating notched disks (puller blades) positioned so that the edges of the two disks overlap, two power-driven rotating shafts to propel the disks, two dome covers to constrain soil and debris flying up from the disks, and a supporting structure which holds the disks in place and permits adjustment in the blade's lateral angle.

The disks have an approximate diameter of 30 inches. The notches on the disks' periphery are about 1½ inches in width and spaced about an inch apart. The disks differ from ordinary blades in that their edges and the interior of their notches are blunt rather than sharp. These blunt surfaces facilitate the pulling action of the overlapping disks as they rotate.

When operating, the harvestor's counter-rotating disks are tilted forward so that the leading edge of the disks penetrates the ground in front of the harvester, causing the stem of the tomato to be engaged by the notches of the overlapping disks. The plant stem is lifted by the overlapping disks and severed from its roots by the pulling action of the rotating disks.

The header is mounted on a wheeled conveyor section. As the stem passes through the disks, the plant is deposited on a conveyor whose bed is made of metal segments linked together. The conveyor bed keeps the plant and vegetables moving toward the main frame structure while permitting the soil to pass through the conveyor bed.

The conveyor is attached to the main frame of the harvester by a flexible coupling device. The device permits the movement of the conveyor and header to adapt to the contour of the ground as the entire harvester mechanism moves along. The main frame structure consists of shaker and sorting sections which function to separate the vegetable from the plant.

While the harvester can be adopted for purposes of self-propulsion, it is typically used in conjunction with a tractor. The harvester comes with platforms to carry workers while the machine is in operation. The harvester is equipped with manual controls which can be used to adjust the tilt of the disks and regulate other functions performed by the harvester.

The '613 patent covers those patentable aspects of the tomato harvestor involving the use of the header. The patent consists of ten claims, all of which are "combination" claims. The patent along with sixteen other patents is listed on an aluminum plate which is attached to every harvester sold. There is no way of knowing through a visual inspection of the machine which of the harvester's parts are within the patents listed on the attached plate.

Farmers Supply's principal source of business is selling replacement parts for farm machinery. Since August, 1983, it has sold replacement disks for the Porterway Tomato Harvester. Farmers Supply does not manufacture these disks, nor does it obtain them from Porterway. Farmers Supply does not act as a supplier for original equipment manufacturers. (Cannon Affidavit ¶ 9). It's replacement disks are sold exclusively to farmers owning Porterway Harvesters whose blades are worn out. (*Id.*). Although Porterway markets its own replacement disks for its harvesters at $112.70 per blade (Plaintiffs' Re-

sponses to Interrogatories I–8), a replacement disk from Farmers Shipply costs only $79.50. (Cannon Affidavit ¶ 7).

There is no dispute as to the similarity between the disks marketed by Porterway and the replacements sold by Farmers Supply. The disks are virtually identical in every respect with the possible exception of the type of steel used and the thickness of their gauge. In February of 1983, some six months prior to Farmers Supply's sales of the disks, its employees conducted a detailed inspection of a Porterway disk. Porterway's disks carry no markings except a designation that they are manufactured in the United States. Farmers Supply's disks are marked: "Del-Mar-Va made in England." Porterway contends that Farmers Supply's sale of disks infringes claims 9 and 10 of the '613 patent.

The disks for a Porterway Tomato Harvester are expected to wear out long before the harvester itself does. A disk will typically last about half of a harvest, although any estimate will depend on the size of a farmer's acreage and the type of soil. Porterway suggests the machine's five-year depreciation period for tax purposes as an estimate of the machine's useful life. (Plaintiffs' Responses to Interrogatories I–9). Farmers Supply estimates the actual life of a harvester at around ten years during which time the farmer may have worn out as many as twenty pairs of disks. (Cannon Affidavit ¶ 9). Porterway does not sell headers separately from its harvester, and a new harvester costs $42,400. (Plaintiffs' Responses to Interrogatories I–8).

Porterway is a registered federal trademark (Reg.No. 583,362). After substantial but by no means exhaustive discovery, involving production of all of Farmers Supply's sales slips, two instances have come to light in which the Porterway name was used by a Farmers Supply employee. On one invoice, dated April 25, 1984, the following phrase appears: "Cutter Blade— Porterway Harvester to Fit." (Cannon Affidavit, Exhibit A). A second invoice, dated August 28, 1984, states: "Cutter Blade—

Porter Way Harvester to Fit." (*Id.*, Exhibit B). Farmers Supply asserts that, to the best of its knowledge, its employees have never tried to deceive customers through any representation that the puller blades (or disks) sold were manufactured by Porterway. (*Id.* ¶¶ 11, 14).

## PATENT INFRINGEMENT

Porterway alleges that Farmers Supply's sale of disks infringes claims 9 and 10 of the '613 patent both directly and contributorily. Farmers Supply has responded with three defenses: (1) its sales do not infringe any of the claims contained in the '613 patent; (2) the '613 patent is invalid; and (3) Porterway's misuse of the '613 patent bars recovery in an action for infringement.

Defendant's motion seeks summary judgment with respect to the first of these defenses. A finding of infringement requires that the sale of an article either itself comes within the scope of a patent claim or that the article either is uniquely suited for purposes of infringement or is knowingly sold to someone who will use it for that purpose. 35 U.S.C. § 271. There is no factual dispute regarding the nature of the articles sold by Farmers Supply. The defendant, however, contends that a finding of infringement is precluded because sale of the puller blades to owners of Porterway Harverters neither directly nor contributorily infringes the '613 patent.

█ Actions arising under the patent laws are no less subject to summary judgment than any other type of action, once a moving party has met his burden under Fed.R.Civ.P. 56(c). *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 835 (Fed.Cir.1984); *Chore-Time Equipment, Inc. v. Cumberland Corp.*, 713 F.2d 774, 778–79 (Fed.Cir. 1983).

█ In this case, the overriding issue is one of claim construction. Claim construction is generally an issue of law rather than one of fact. *Molinaro v. Fannon/Courier Corp.*, 745 F.2d 651, 654 (Fed.Cir.1984); *Fromson v. Advance Offset*

*Plate, Inc.*, 720 F.2d 1565, 1569 (Fed.Cir. 1983). In construing the scope of a patent claim, the trial court must look at the language of the claim in question, the specification of the other claims in the patent, and the patent's prosecution history. *See Lemelson v. United States*, 752 F.2d 1538, 1549 (Fed.Cir.1985); *SSIH Equipment, S.A. v. USITC*, 718 F.2d 365, 376 (Fed.Cir. 1983). Although this may require the Court to make certain factual findings, this does not preclude summary judgment unless the issues of fact are disputed.

### A. Claim Construction

Claim 9, according to its preamble, purports to be a claim regarding a header construction. Defendant reads this description in its broadest sense to mean that claim 9 applies to a header construction in its entirety. Plaintiffs contend, however, that claim 9 is far narrower in scope, and that it applies solely to the header's disks.

The claim itself reads as follows:

9. In a tomato harvesting machine of the type movable through a field to remove plants and fruit from the ground, a header construction for mounting at the forward end of the machine to sever plant stems and direct plants and fruit onto the machine, said header construction comprising:

a. a pair of substantially flat, circular disks arranged in side-by-side relation with overlapping edges for rotation about substantially parallel axes through the center of said discs;

b. power drive means imparting rotation to said disks in opposite directions with the forward edges thereof, with respect to the intended direction of movement of the harvester, moving toward one another; and

c. a plurality of evenly spaced notches extending into the peripheries of each of said discs and inclined generally in the intended direction of rotation, said notches being spaced to provide an edge of the circular disc periphery there between, whereby the stems of plants are engaged between said discs and pulled upwardly and rearwardly to be severed from the roots, each of said notches including:

i. a first straight edge extending inwardly from a first point on the disc periphery at an angle to the radius included in the direction of rotation;

ii. a rounded edge extending from the inner terminus of said first edge in the direction of rotation; and

iii. a second straight edge extending from the terminus of said rounded edge to a second point on said disc periphery.[1]

(Plaintiff's [sic] Answering Brief, Tab A).

Both parties agree that claim 9 is a combination patent comprised of multiple elements. The plaintiffs provide a more detailed inventory of elements contained in that claim, enumerating fourteen different elements all together.[2] These elements,

---

1. Plaintiffs also claim the defendant has infringed claim 10. Claim 10 reads:

 10. The invention according to claim 9 wherein the length of said edge of the circular disc periphery between each of said notches is not greater than the distance between said first and second points.

 The Court's discussion is limited to claim 9, since claim is dependent on claim 9.

 Unfortunately, the '613 patent uses "disk" and "disc" interchangeably. For the sake of consistency, the Court will use "disk" only.

2. These fourteen elements appear in Plaintiff's Answering Brief as follows:

 (1) a pair of substantially flat, circular disks;
 (2) arranged in side-by-side relation with overlapping edges;

(3) for rotation about substantially parallel axes through the center of said discs;
(4) power drive means;
(5) imparting rotation to said disks in opposite directions;
(6) with the forward edges thereof, with respect to the intended direction of movement of the harvester, moving toward one another; and
(7) a plurality of evenly spaced notches extending into the peripheries of each of said discs and inclined generally in the intended direction or rotation, said notches;
(8) being spaced to provide an edge of the circular disc periphery there between;
(9) whereby the stems of plants are engaged between said discs and pulled upwardly and

set forth in the claim's three sections, are of three types: structural, structural relationships, and means.

The language of claim 9 goes a long way toward resolving any dispute with respect to its scope. Plaintiffs' own list of elements makes clear that the claim goes beyond merely the structure of the disks themselves. Not only do the disks lack the "power drive means" provided in section (b), but the disks by themselves also lack the structural relationships provided in the claim's other elements. Elements 2–6 from plaintiffs' list indicate that claim 9 concerns elements not exhausted by the disks' structure or their design.

 Defendant argues that this conclusion regarding the breadth of claim 9 is supported by the patent owner's use of the term "header construction" in the preamble of the claim, a term used in other parts of the patent to refer to the entire header apparatus. While the phrase "the patentee is permitted to be his own lexicographer"

carries with it the connotation that he will use terms consistently throughout his patent, *see Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 889 (Fed.Cir.1984), slavish adherence to this principle in construing claims is unnecessary when the inconsistent usage is not a source of confusion. In this particular case, the use of the term "comprising" to connect the body of the claim 9 to its preamble which contains the term "header construction", gives adequate warning that the body sets forth the elements for which Porter was making a claim. D. Chisum, 4 *Patents* §§ 58.06[1][b] & 18.03[4] (rev. perm. ed. 1985).

More importantly, the header as described in claim 1 is clearly meant to be different than the header device described in claim 9 based solely on a comparison of the respective claims' elements. Indeed, the body of claim 1 (consisting of six sections) contains three sections which are virtually identical to the three sections of which claim 9 consists.[3] Thus, claim 9 ap-

---

rearwardly to be severed from the roots, each of said notches including:
(10) a first straight edge extending inwardly from a first point on the disc periphery;
(11) at an angle to the radius inclined in the direction of rotation;
(12) a rounded edge extending from the inner terminus of said first edge in the direction of rotation; and
(13) a second straight edge extending from the terminus of said rounded edge;
(14) to a second point on said disc periphery.
Plaintiff's [sic] Answering Brief 12–13.

3. Claim 1 reads:
1. Apparatus for movement through a field to assist in crop harvesting comprising:
a. a frame mounted for movement over the ground;
b. a pair of substantially flat, circular disks arranged in side-by-side relation with overlapping edges for rotation about substantially parallel axes through the center of said discs;
c. support means operatively connected to said support frame maintaining said disks with their forward and rearward edges, with respect to the direction of movement of the apparatus, respectively below and above ground level, said axes being tilted forwardly from the top by an acute angle with respect to the vertical;
d. a pair of dome-shaped elements concentrically arranged about said axes and sloping downwardly therefrom to the upper surface

of said disks, said elements covering a substantial portion of said upper surfaces and mounted for rotation with said disks;
e. power driven means imparting rotation through said support means to said disks in opposite directions with said forward edges moving toward one another, whereby a layer of earth is lifted by said forward edges and moved rearwardly upon said disks, the height of said dome-shaped elements being such that said layer of earth and material carried thereon are laterally constrained and compacted by said dome-shaped elements;
f. a plurality of evenly spaced notches extending into the peripheries of each of said discs and inclined generally in the intended direction of rotation, said notches being spaced to provide an edge of the circular disc periphery therebetween, whereby the stems of plants are engaged between said discs and pulled upwardly and rearwardly to be served from the roots, each of said notches including:
i. a first straight edge extending inwardly from a first point on the disc periphery at an angle to the radius included in the direction of rotation;
ii. a rounded edge extending from the inner terminus of said first eddge in the direction of rotation; and
iii. a second straight edge extending from the terminus of said rounded edge to a second point on said disc periphery.
Plaintiff's [sic] Answering Brief, Tab A.

pears to claim a more general header apparatus (that is, one with fewer elements) than the one claimed in claim 1 even though claim 9's preamble refers to a "header construction", a term which is used elsewhere in the patent to signify an apparatus containing additional elements besides those enumerated in claim 9.

Although the use of "header construction" in the preamble to claim 9 is not determinative of the claim's actual breadth, neither does the term's presence support plaintiffs' contention that the claim is limited to the disks *per se*. This point is amply borne out by the patent's prosecution history.

The plaintiffs' efforts to obtain the '613 patent were preceded by two abandoned applications which were both rejected by the Patent Office. The first of these, the '254 application, was filed in December of 1981. From the beginning, Porter sought to establish a claim, roughly analogous to claim 1 in the '613 patent, that would provide patent protection for his header device. In the context of the '254 application, the relevant claim was claim 8 and later claim 15, which was an amendment of claim 8, after claim 8 was rejected. Both claims provided for use of a pair of disks and both combination claims were rejected because they lacked any novelty.

In October 1974, Porter filed the '851 application which was a continuation-in-part ("CIP") of the '254 application. Once again, Porter sought to obtain a claim on a header section that used the puller blade technology. And once again, the claim, this time claim 5, was rejected in its original form and, as amended, because the claim was obvious.

Another CIP application, the '819 application, was filed in December of 1976 and this application, after amendment, subsequently became the '613 patent. The difference between the original '819 claims and the amended claims provides an important insight into the ultimate scope of claim 9 in the '613 patent. In the '819 application, Porter set forth in claim 1 much of the body of what was to become claim 1 in the '613 patent. The claim was rejected as obvious. Claims 2 and 3 were also rejected because they were presented as dependent claims. As Plaintiffs' Supplemental Brief notes, however, the patent examiner informally indicated that claim 3 was probably patentable if it was not presented as a dependent claim. Porter, in amending his patent application, deleted claim 3 and inserted its elements as the three subsections of claim 1's section (f). This section, along with two others from claim 1, were used to construct claim 9. The inclusion of the novel element with other non-patentable elements made the combination in claim 1 patentable. Porter, however, by conscious and deliberate construction or by an incredible oversight, did not claim these novel elements separately, which were admittedly related to the disks' design by themselves, but only in combination with other elements in claims 1 and 9 not relating to the disks *per se*. Thus, claim 9's language, its specification in the '613 patent, and the '613 prosecution history all point to the same conclusion: claim 9 contains elements that are not strictly related to the structure of the disks or their design.

### B. Direct Infringement

Farmers Supply admits to selling disks for use in Porterway's Tomato Harvesters. Plaintiffs allege that these sales directly infringe claim 9. The "sale of an unpatented component of a combination patent is not a direct infringement under 35 U.S.C. § 271(a)." *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 340, 81 S.Ct. 599, 601, 5 L.Ed.2d 592 (1961) (hereinafter *"Aro I"*). Thus, the sole issue posed by plaintiffs' allegation is a legal one: whether claim 9, as construed, reads on the disks.

■ The Court has construed claim 9 as including elements other than the disk *per se* or their design. Indeed, plaintiffs

---

Sections (b) and (f) are repeated verbatim in claim 9's sections (a) and (c) respectively. The other section in claim 9, section (b), is similar but not identical to section (c) in claim 1.

even concede this point. In short, the disks sold by themselves omit some of the elements of claim 9. The omission of any one element of a combination claim precludes a finding of direct infringement. *See Ebeling v. Pak-Mor Manufacturing Co.*, 683 F.2d 909, 913–14 (5th Cir.1982) (*citing Water-Meter Co. v. Desper*, 101 U.S. (11 Otto) 332, 335, 25 L.Ed. 1024 (1880). Accordingly, plaintiffs' allegation of direct infringement must be rejected as a matter of law.

■ Plaintiffs' attempt to preserve their claim arguing that the disks' novel design is actually the "essential" element in the claim, and therefore, Farmers Supply's sales should be deemed directly infringing. This tired refrain from disappointed holders of combination patents has been repeatedly and decisively rejected by courts. Simply put, the lawful prerogative of a holder of a combination patent extends only to the sale and manufacture of articles that contain every element of the claim or an equivalent thereof, and not to the independent elements by themselves. This straightforward rule is applied without regard to the novelty of a particular element or the characterization of that element as essential. *Pierce v. Aeronautical Communications Equipment, Inc.*, 255 F.2d 458, 463 (5th Cir.1958); *accord Aro I, supra*, 365 U.S. at 344–45, 81 S.Ct. at 604.

Nor is it difficult to understand the foundation for such a rule. First, any other approach would be an invitation for courts to rework claims. The evaluation of claims' "essential" elements would become increasingly subjective and more importantly, the preliminary evaluation conducted by the Patent Office would lose much of its significance. A patent carries a statutory presumption of validity. Ostensibly, the basis for such a presumption is that a patent examiner has made a preliminary

evaluation of the claim which is entitled to some deference. If a patentee could extend his patent monopoly to elements of a patented combination designated as "essential," scrutiny of that particular element's patentability by the Patent Office is circumvented for the Patent Office has no way of knowing which element the patentee will claim is essential.

■ Endorsing plaintiffs' "essential" element argument would also severely undermine the purpose of 35 U.S.C. § 112. Section 112 requires the patent applicant adequately disclose his invention in a clear, precise and definite manner. One purpose of this requirement is to alert the public regarding the limits of the patent holder's monopoly so as not to deter legitimate competition. *See, e.g., United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 232, 63 S.Ct. 165, 167–68, 87 L.Ed. 232 (1942); *Schriber-Schroth Co. v. Cleveland Trust Co.*, 305 U.S. 47, 57, 59 S.Ct. 8, 12–13, 83 L.Ed. 34 (1938). Obviously, if a holder of a patented combination also was given an implied claim with respect to selected elements, potential competitors would be forced to vacate an entire area of competition for fear that sales of an unpatented component encroached on an "essential" element of the patentee's combination patent.

## C. Contributory Infringement

■ Although the fact that the puller blades themselves are unpatented components of a combination claim disposes of plaintiffs' allegation of direct infringement against Farmers Supply, that fact alone is not determinative of plaintiffs' claim for contributory infringement.[4] Of course, there can be no contributory infringement in the absence of direct infringement. *Aro I, supra*, 365 U.S. 336, 341, 81 S.Ct. at 602.

4. Plaintiffs have formulated their claim of contributory infringement in language that might fall under either 35 U.S.C. § 271(b) or (c). The two provisions are entirely complementary. Section 271(c) is narrower in scope in that it applies exclusively to the sale of non-staple articles. The articles sold in this case are non-staples. In view of the facts in this case, the Court can discern no difference in the outcome regardless of which provision is applied, nor have the parties pointed to any relevant distinguishing features. Accordingly, the Court will proceed as if the claim had been brought under § 271(c). *See generally* D. Chisum, 4 *Patents* § 17.04[3] (rev. perm. ed. 1985).

So far, however, the Court's decision has only eliminated the possibility of direct infringement through the *sale* of the unpatented component. In addition, the Court must consider whether *use* by purchasers of the unpatented component, in this case owners of Porterway Harvesters, directly infringes the '613 patent when those purchasers use the disks as replacements in their harvesters. If the purchasers' use is directly infringing, then Farmers Supply's sale of the component may be contributorily infringing.

This principle was recently reaffirmed by the Supreme Court in *Dawson Chemical Co. v. Rohm and Haas Co.*, 448 U.S. 176, 100 S.Ct. 2601, 65 L.Ed.2d 696 (1980). In that decision, the court recognized that sale of a non-staple would constitute contributory infringement within the scope of 35 U.S.C. § 271(c), when the purchasers' use of the unpatented non-staple necessarily entailed direct infringement of the patentee's process patent.

Considered in the absence of any other facts, Farmers Supply's sale of blades is analogous to the sales implicitly condemned by the Supreme Court in *Rohm & Haas*. The disks sold by Farmers Supply were suited for a unique purpose, namely, for use as puller blades on a Porterway Tomato Harvester. Moreover, Farmers Supply recognized the purpose for which customers purchased its disks. Farmers Supply's sales invoices clearly demonstrate that the disks sold would be used to replace worn-out disks on Porterway Harvesters.

▮▮▮ These facts, however, do not mean that defendant's argument for summary judgment on the contributory infringement claim is fatally flawed. Although the *Rohm & Haas* decision was unequivocal in recognizing the breadth of the contributory infringement concept in situations involving direct infringement, the decision also affirmed the continued vitality of the repair/reconstruction doctrine which represents an exception to a patentee's general right to exclude others from making his invention. The doctrine relieves an owner of a patented combination from liability for direct infringement when the owner repairs his combination by replacing one of the unpatented components. *See Wilbur-Ellis Co. v. Kuther*, 377 U.S. 422, 424, 84 S.Ct. 1561, 1563, 12 L.Ed.2d 419 (1964) (*citing Wilson v. Simpson* 50 U.S. (9 How.) 109, 123, 13 L.Ed. 66 (1850)).

The Supreme Court canvassed the doctrine's application to the issue of contributory infringement in its two *Aro* decisions. *See Aro I, supra*, 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592; *Aro Manufacturing Co. v. Convertible Tops Replacement Co.*, 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964) (hereinafter *"Aro II"*). Both cases arose out of the same series of transactions in which the party accused of contributory infringement had sold an unpatented non-staple component used in a patented combination. The cases are notable because, in the first case, the Court held that liability was precluded, while in the second, the Court held out the possibility of a finding of liability. The disparity in outcomes highlights two different issues surrounding the doctrine's application. *Aro I* concerned the factors distinguishing legitimate repair from illicit reconstruction for a user authorized to make repairs. In adhering to a broad definition of repair, the *Aro I* Court found that no direct infringement had occurred, and thus, any finding of contributory infringement was precluded. In *Aro II*, the sales of the non-staple had been to an unauthorized user of the patented combination. Although the sales in question may have been for purposes of repair, the Court held that the exception which protected the accused contributory infringer in *Aro I* was simply inapplicable because repair by the user to whom the non-staple was sold constituted direct infringement.

Farmers Supply seizes upon the "repair" exception to argue that a finding of liability for contributory infringement is precluded because of the absence of any direct infringement. Since no one disputes that Farmers Supply's customers received their harvesters originally from Porterway, there is no question of Farmers Supply's customers' authorization to engage in re-

pairs. In response, plaintiffs contend that direct infringement exists because Farmers Supply's customers are engaged in illicit reconstruction rather than legitimate repairs.

 In light of *Aro I* and its progeny, it is impossible to reconcile plaintiffs' position with applicable legal standards of repair. With only slight exaggeration, Justice Harlan, in his dissenting opinion in *Aro I*, summarized the majority's opinion as holding "that there can be no direct infringement (and hence, of course, no contributory infringement) of a combination patent by replacement of any of the components of the patented entity unless (1) such component is itself separated patented, or (2) the entire entity is rebuit at one time," assuming, of course, that the non-staple is sold to a purchaser possessing the right to engage in repairs.[5] *Aro I, supra,* 365 U.S. at 370, 81 S.Ct. at 617. Insofar as Justice Harlan's summary can be viewed as an accurate statement of the requisite elements for taking the use of an unpatented non-staple out of the realm of the "repair" exception, then clearly they have not been met in this case.[6] Earlier it was determined that claim 9 does not read solely on the harvester's disks. And moreover, since the disks sold are used to replace the existing header's disks, it is impossible to find that Farmers Supply's customers are engaged in rebuilding the header.

The plaintiffs contend that a more flexible standard which embodies a number of different factors should be used to determine whether replacement of a harvester's disks constitutes repair or reconstruction. Such an approach was advocated by Justice Brennan in his concurring opinion in *Aro I* in which he articulated the following test:

"Appropriately to be considered are the life of the part replaced in relation to the useful life of the whole combination, the importance of the replaced element to the inventive concept, the cost of the component relative to the cost of the combination, the common sense understanding and intention of the patent owner and the buyer of the combination as to its perishable components, whether the purchased component replaces a worn-out part or is bought for some other purpose, and other pertinent factors." (footnotes omitted).

365 U.S. at 363–64, 81 S.Ct. at 613–14.

 Applying these considerations to the facts in this case leads to the same

---

5. This approach, as was noted recently, eschews any "suggestion that the legal distinction between 'reconstruction' and 'repair' should be affected by whether the element of the combination that has been replaced is an 'essential' or 'distinguishing' part of the invention." *Dawson Chemical Co. v. Rohm & Haas Co.,* 448 U.S. 176, 217, 100 S.Ct. 2601, 2624, 65 L.Ed.2d 696 (1980).

6. Arguably determining whether a user's actions constitute permissible repair or illegitimate reconstruction might present a question of fact rather than one of law precluding summary judgment. The better view, however, is that the question of repair or reconstruction is primarily one of law that will seldom involve disputed issues of fact. This approach is supported by considerations of precedent and policy. First, on each of the recent occasions in which the Supreme Court has applied the repair/reconstruction doctrine to overturn lower court decisions in favor of patent holders, it has done so, reversing the decisions as a matter of law rather than merely vacating them. *See Aro I, supra,* 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961); *Wilbur-Ellis Co. v. Kuther,* 377 U.S. 422, 84 S.Ct. 1561, 12 L.Ed.2d 419 (1964). Even Justice Brennan's concurring opinion in *Aro I* which sug-

gests that courts weigh a number of factors before making a final determination, argues that this more elaborate inquiry should be resolved as a matter of law rather than as one of fact. *Aro, I, supra,* 365 U.S. at 367, 81 S.Ct. at 616. Second, lower court decisions, subsequent to *Aro I,* have addressed the issue as one of law. *See National-Standard Co. v. UOP, Inc.,* 616 F.2d 339 (7th Cir.1980) (affirming summary judgment in which the lower court had found that defendant's sales were not infringing because customers were engaged in repair of patented combination); *see also Wells Manufacturing Corp. v. Littelfuse, Inc.,* 547 F.2d 346 (7th Cir. 1976) (same); *TSC Industries, Inc. v. International Harvester Co.,* 406 F.2d 406 F.2d 53 (7th Cir.1968) (same). Finally, allowing such issues to invariably go to trial would place in the hands of patent holders a potent weapon to use against merchants dealing in unpatented components. The threat of significant litigation costs, made credible by the difficulty in obtaining summary disposition of cases involving ordinary repairs, would significantly deter legitimate competition in unpatented components.

conclusion reached earlier, namely, that an owner of a Porterway Harvester does not infringe the combination claim when he replaces his harvester's disks. The harvester's disks represent only a minute fraction of the harvester's entire cost and during the life of any harvester, a purchaser can expect to wear out many sets of disks. Moreover, Porterway's own commercial practices indicate that replacing a blade is more appropriately viewed as repair rather than reconstruction. Porterway does not sell headers independently of its harvesters. It does, however, market replacement disks.

Indeed, the facts in this case are strikingly similar to cases decided both before and after *Aro I* involving tools involving parts subject to wear. These cases have held almost uniformly that replacement of a worn part in a patented combination is repair rather than reconstruction. *Wilson v. Simpson*, 50 U.S. (9 How.) 109, 13 L.Ed. 66 (1850) is perhaps the leading case of this type. The invention at issue there was a planing machine which required new cutting knives every three months to remain operational. The Supreme Court decided in favor of the user on the relatively narrow grounds that regardless of the component's perishability *per se*, the machine itself contemplated the frequent replacement of the components and thus, replacement would be deemed repair. *Id.* 50 U.S. (9 How.) at 125–26.

Although later cases broadened this holding by explicitly taking into account the components' perishability, these cases have all reaffirmed *Wilson's* basic principle. *See, e.g., Micromatic Hone Corp. v. Mid-West Abrasive Co.*, 177 F.2d 934 (6th Cir. 1949) (although abrasive stones were most valuable and significant part of patented honing tool, replacement of worn stones constituted repair because stone was expected to be worn-out and replaced during the stone holder's useful life); *Gillette Safety Razor Co. v. Standard Safety Razor Co.*, 64 F.2d 6 (2d Cir.1933) (disposable blades, which were used in razor and which were not separately patented, could be replaced as a form of repair). Cases decided

after *Aro I* have remained consistent with this line of analysis. *See, e.g., National-Standard Co. v. UOP, Inc.*, 616 F.2d 339 (7th Cir.1980) (finding user's efforts in replacing sieve in an apparatus that separated fine-grain solids constituted legitimate repair); *TSC Industries, Inc. v. International Harvester Co.*, 406 F.2d 53 (7th Cir. 1968) (replacing rubberized doffers in a mechanized cotton picking machine held to be legitimate repair).

Plaintiffs dispute the similarity of these cases to the one at bar, contending that the issue of repair must be evaluated against the narrow terms of claim 9 rather than in terms of the harvester as a whole. Of course, if a component used to repair a patented combination is itself patented, then a purchaser's authorization to use the patented component for repair without the patent holder's permission is severely restricted. *See Hensley Equipment Co. v. Esco Corp.*, 383 F.2d 252 (5th Cir.1967) (no legitimate repair of patented combination pertaining to excavating teeth where repair directly infringed on one of the separate claims of which the combination consisted); *see also Aro I, supra,* 365 U.S. at 370, 81 S.Ct. at 617 (Harlen, J. dissenting). This Court, however, has already determined that claim 9 does not read solely on the disks. Hence, mere use of the disks cannot directly infringe claim 9.

Nor does replacement of the disks involve reconstruction of the device claimed in claim 9. Porterway, by selling a harvester, which includes a header device that embodies the elements in claim 9, to the purchaser, authorizes him to make repairs on the header. Plaintiffs' argument seems to suggest that only the physical elements of the claim are relevant in determining whether the user is engaged in repair or reconstruction. Such an approach disregards the significance of the claim's intangible elements. Although claim 9 has at least one other structural element besides the disks, namely, the power driven means, the claim consists of numerous intangible elements, such as structural relationships, embodied in the header's struc-

ture. By embodying these intangible elements in a structure more durable than the disks, the patentee effectively increases the scope of the user's authorization to repair the physical elements of the claim. Since the header in Porterway's Harvester embodies the intangible elements of claim 9, the user is authorized to repair the header by replacing its disks so long as the physical structure embodying the intangible elements of claim 9 is not replaced in its entirety.

Because neither Farmers Supply's sale of blades, nor use by purchasers of the blades constitutes direct infringement, Farmers Supply's sales cannot be deemed contributorily infringing.

### TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION

Although Porterway's disks are not patented, Porterway claims that Farmers Supply has infringed Porterway's trademark and engaged in unfair competition in selling replacements to owners of harvesters. Upon information and belief, Porterway alleges that Farmers Supply has used the "Porterway" name—a registered federal trademark—in its business in a manner that is likely to confuse or deceive purchasers of puller blades.

After a fair amount of discovery in which Farmers Supply produced all sales invoices relating to the sale of disks, only two incidents came to light connecting Farmers Supply with the use of the Porterway name. Each incident involves a sales invoice indicating that the disks (referred to as "cutter blades") were sold to fit a Porterway Harvester. The invoices, however, do not identify the disks sold as Porterway disks.

Farmers Supply's use of Porterway's name on its sales invoices does not violate either 15 U.S.C. § 1114(1), which prohibits the use of trademarks in a manner likely to cause confusion to purchasers, or 15 U.S.C. § 1125(a), which prohibits unfair competition through misrepresentation of the commercial source of products sold to unsuspecting purchasers. Merely specifying that a replacement part will be suitable for use in a product bearing a trademarked name lacks the requisite element of actual or foreseeable deception to the public. *See Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 911 (Fed.Cir.1984).

Admittedly, purchasers may conceivably have been deceived or confused when they bought the disks as plaintiffs allege, but the conjecture must be put aside momentarily to evaluate the evidentiary significance of the sales invoices. The invoices themselves are not evidence that purchasers were deceived. Indeed, if anything, the invoices would appear to support a contrary inference. The disks are designated as replacement disks for a Porterway Harvester, rather than as disks manufactured by Porterway. Ironically, plaintiffs have stated that the invoices were the sole basis for their allegation of trademark infringement and unfair competition. (Plaintiffs' Responses to Interrogatories: I–4, 5), despite the fact that the invoices themselves support a contrary inference.

Now plaintiffs argue that, regardless of the sales invoices, purchasers may still have been deceived regarding the origin of the disks sold by Farmers Supply, and that this possibility precludes summary judgment. The Court cannot agree. Fed.R. Civ.P. 56(c) places the initial burden of establishing the absence of any genuine issue of material fact on the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Defendant has produced all of its sales invoices relating to disks. These invoices identify the names of customers. In addition, an officer of Farmers Supply has denied ever "suggest[ing] to any customer that any of the replacement parts it sells were made by or for Porterway." (Affidavit of Edward Cannon). Although the denial is conclusory in nature, several factors support its credibility. First, the truth of the allegations made by Porterway given the nature of those allegations can only be refuted by a conclusory assertion to the contrary. Second, the sales slips mentioning Porterway corroborate the manner in which Farmers Supply's officer claims the "Por-

terway" brand name was used. Finally, the affiant frankly admits to inspecting Porterway's blades prior to obtaining a supplier of virtually identical blades. Presumably, only Farmer Supply's employees had knowledge of this admission against interest, and yet no attempt has been made to hide the fact. Thus, although conclusory, Cannon's affidavit is nevertheless a credible denial of trademark infringement and unfair competition.

The foregoing record is strong enough to shift the burden to the non-moving party under Rule 56(e) to set forth specific facts showing that there is a genuine issue for trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *accord, Sound Ship Building Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 97 (3d Cir.), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976). Summary judgment will not be withheld on the mere possibility that evidence may be forthcoming in the absence of an explanation of why discovery has not been sought or completed. *See Mid-South Grizzlies v. National Football League*, 720 F.2d 772, 779–81 (3d Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 2657, 81 L.Ed.2d 364 (1984). Although plaintiffs complain that they received the sales slips just prior to the setting of the briefing schedule, that schedule was set nearly two months prior to the completion date for briefing. Thus, plaintiffs had more than enough time to seek statements from Farmers Supply's customers. The briefing schedule expressly provided for continued discovery on matters pertaining to the summary judgment motion. (Stipulation dated January 16, 1985). In short, plaintiffs have completely failed to set forth any specific facts in support of its allegations that consumers may have been deceived by Farmers Supply's sales practices.

Even if Porterway were successful in locating a purchaser who was actually confused, Porterway would be entitled to relief only after a trial in which it demonstrated that the purchaser's confusion could reasonably be attributed to the manner in which Farmers Supply referred to Porterway. The law of trademarks simply does not entail a blanket prohibition on the use of a tradename by competitors. *See, Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 911 (Fed.Cir.1984) (*quoting Prestonettes, Inc. v. Coty*, 264 U.S. 359, 360, 44 S.Ct. 350, 351, 68 L.Ed. 731 (1924) (Holmes, J.)). If the Lanham Act prohibited competitors from mentioning a product for which replacement parts were suited, parties marketing patented combinations could effectively achieve through trademark protection what is not permitted under the patent laws, namely, barring the sale of replacement parts for their products by competitors. It is precisely this kind of protection that plaintiffs' present action seeks to obtain. Accordingly, the Court finds as a matter of law the defendant is entitled to summary judgment on plaintiffs' claim under the Lanham Act arising from Farmers Supply's use of the name "Porterway" on its invoices both because the plaintiffs have failed to set forth specific facts supporting their allegations that purchasers have been deceived, and because the only known instances in which Farmers Supply used Porterway's name was in a privileged context.

At oral argument, counsel for plaintiffs intimated yet another argument in hopes of withstanding summary judgment. The Court was invited to compare the differences between Porterway's blades and the blades sold by Farmers Supply. To the untrained eye, the blades appeared identical save for markings indicating their place of origin. The plaintiffs' argument, reformulated in its best light, seems to be that summary judgment is inappropriate if Farmers Supply copied the design of Porterway's blades. Even assuming that the allegation underlying Porterway's argument is true, the allegation by itself will not support a cause of action under the Lanham Act. A design must exhibit non-functional characteristics before it can be protected as a trademark. *Textron, Inc. v. USITC*, 753 F.2d 1019, 1024 (Fed.Cir.1985). Conversely, a product

that embodies a design which is *de jure* functional is not subject to protection under federal law unless patented. *New England Butt v. USITC,* 756 F.2d 874, 877 (Fed.Cir.1985). *See Inwood Laboratories, Inc. v. Ives,* 456 U.S. 844, 857 n. 20, 102 S.Ct. 2182, 2190 n. 20, 72 L.Ed.2d 606 (1982).

A product's feature is functional if it is essential to the use or purpose of the article or if it affects the cost or performance of the article in the purpose for which it serves. Plaintiffs have failed to point to any non-functional aspect of the disk's design. Nor has it sought the protection of the disks' design through federal registration of the design. Moreover, the Court's inspection of the product did not disclose any non-functional features. The disks' dimensions are required to fit on the header. The flat edge of disks' notches facilitate their pulling action. The holes in the center are necessary to permit power drive axles to be attached. Other than these features, there remains only a hunk of black metal which is not, by itself, subject to trademark protection.

Although "functionality" is typically regarded as a question of fact, the record is entirely devoid of any evidence suggesting that blades' design is other than functional. Accordingly, the Court finds that the blades are *de jure* functional. Because the disks are *de jure* functional, Farmers Supply could copy the unpatented articles without Porterway's permission.

▮▮▮▮ Finally, the plaintiffs have tacked on to their complaint a claim for unfair competition under state law. Although the plaintiffs expended no effort in briefing Delaware law on the question, it is nevertheless apparent that the claim suffers from the same deficiencies as plaintiffs' federal claim for unfair competition. "Under Delaware law, a reasonable probability of deception as opposed to a mere speculative possibility is required to establish unfair competition." *See Coca-Cola Co. v. Nehi Corp.,* 27 Del.Ch. 318, 36 A.2d 156, 164–65 (1944). As discussed above, plaintiffs have failed to set forth specific facts supporting any allegation of deception.

Aside from the theory that consumers were deceived, plaintiffs do not have a credible theory of liability for unfair competition under state law. Federal patent law preempts state law insofar as the latter restricts the ability of a firm to copy the functional features of a competitor's unpatented product. *Sears Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); *Compco Corp. v. Day Brite Lighting, Inc.,* 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). The Court's finding that the disks are *de jure* functional with respect to its discussion of the Lanham Act is also determinative of plaintiffs' state law claim. Copying a competitor's unpatented product which exhibits only functional characteristics does not state a cause of action under state law for unfair competition.

CONCLUSION

The Court has reviewed each of plaintiffs' claims for liability as set forth in their complaint and found that none of them admit to a triable issue of fact based on the evidentiary record before the Court. With respect to each claim, defendant is entitled to summary judgment.

The Court is not of the opinion that this action was of such an exceptional nature which would justify the imposition of sanctions in the form of attorneys' fees pursuant to Fed.R.Civ.P. 11. While certain of plaintiffs' claims were weak, especially those concerning trademark infringement and unfair competition, the Court believes the action was neither frivolous, nor brought in bad faith. Accordingly, defendant's request for attorneys' fees is denied.

An Order will issue in accordance with this Opinion.